# 17-1856-cv(L), 17-1858-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

D. JOSEPH KURTZ, Individually and on Behalf of All Others Similarly Situated,

*Plaintiff-Appellee,*

— v. —

COSTCO WHOLESALE CORPORATION,
KIMBERLY-CLARK CORPORATION,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (WEINSTEIN, J.)

## SUPPLEMENTAL OPENING POST-REMAND BRIEF
## AND SPECIAL APPENDIX

KARA L. MCCALL
DANIEL A. SPIRA
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

EAMON P. JOYCE
KWAKU A. AKOWUAH
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendant-Appellant Kimberly-Clark Corporation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Kimberly-Clark Corporation hereby certifies that it is a publicly held corporation with no parent corporation, and that no publicly held corporation owns ten percent or more of Kimberly-Clark's stock.

/s/ *Eamon P. Joyce*
Eamon P. Joyce

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................... iv

PRELIMINARY STATEMENT ................................................ 1

STATEMENT OF THE CASE ................................................ 3

   A. Weir Testifies to His Hedonic Regression and "Aggregate" Price Premium. ........................................................................ 4

   B. Kimberly-Clark's Fact and Expert Evidence Demonstrates Flaws in Weir's Analysis. ................................................................ 8

   C. The District Court Adheres to Its Previous Rule 23(b)(3) Certification and Denies Weir's Exclusion. .................................. 15

ARGUMENT ........................................................................ 16

I.  THE ADMISSION OF WEIR'S TESTIMONY REQUIRES REVERSAL. ................................................................ 16

   A. Weir's Regression Failed to Consider "Major" Product Attributes. 17

   B. Weir's Testimony Is Inadmissible Because He Cherry-Picked Time Frames and Products. ........................................................ 23

     1. Weir Manipulated His Model's Time Frame. ............................ 23

     2. Weir Manipulated His Dataset. ........................................ 26

   C. Weir's Regression Treated Changing Variables as Constants. ...... 27

   D. The "Marketwide" Flushable Premium Is Not Specific to Kimberly-Clark. ................................................................ 30

   E. Any Causation Testimony Is Inadmissible. ............................ 31

II. THE COURT ERRED IN HOLDING THAT KURTZ SATISFIED RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT THROUGH WEIR. ................................................................ 33

   A. The Court Erred in Concluding that Weir Can Demonstrate *Injury* Through Common Proof Without Significant Individualized Inquiries. ................................................................ 35

     1. The Court Erred in Finding Weir's Aggregate *Damages* Model Capable of Establishing Classwide *Injury* and Predominance.... 35

2. Even if Weir's Model Spoke to Injury, It Implicates Numerous Individualized Issues. ................................................. 41

    a. Weir's Model Implicates Individualized Inquiries About Time of Purchase and Which Products Were Purchased. ..................... 42

    b. Weir's Model Presents Insurmountable *Comcast*-Like Problems Given Changed Flushable-Related Representations and Performance. ................................................................. 44

B. Reversal Also Is Required Because Weir's Model Cannot Demonstrate *Causation* Through Common Proof Without Significant Individualized Inquiries. ............................................. 48

1. Weir Assumes Causation Rather Than Establishing It Through Classwide Evidence. .................................................. 49

2. Association With Higher Price Is Not Causation, And Weir Ignores Actual Evidence Regarding Lack of Causation. ............. 51

CONCLUSION ........................................................................ 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ......................................................... 16, 31

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) ......................................................... 36, 44

*Bickerstaff v. Vassar Coll.*,
    196 F.3d 435 (2d Cir. 1999) ............................................. 1, 17, 20, 22

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit
Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) ................................................................. 32

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ............................................................... 38

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ............................................................... 44, 45, 47

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
    984 F. Supp. 2d 1021 (C.D. Cal. 2013) ............................................ 26

*Cuevas v. Citizens Fin. Grp., Inc.*,
    526 F. App'x 19 (2d Cir. 2013) ......................................................... 42

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ........................................................................... 21

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ............................................................... 43

*EM Ltd. v. Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007) ............................................................... 16

*Fink v. Time Warner Cable*,
    714 F.3d 739 (2d Cir. 2013) ......................................................... 29, 46

*Gale v. IBM Corp.*,
9 A.D.3d 446 (2d Dep't 2004) ............................................ 48

*Gates v. Rohm & Haas Co.*,
655 F.3d 255 (3d Cir. 2011) ............................................... 37

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .......................................................... 38

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP*
*v. Matthew Bender & Co.*,
172 A.D.3d 405 (1st Dep't 2019) ........................................ 48

*Kurtz v. Costco Wholesale Corp.*,
768 F. App'x 39 (2d Cir. 2019) ......................... 3, 34, 42, 48

*Lewis v. Casey*,
518 U.S. 343 (1996) .......................................................... 42

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008), *abrogated on other grounds*
*by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).. 35, 38, 44,
48

*Olin Corp. v. Lamorak Ins. Co.*,
No. 84-cv-1968(JSR), 2018 WL 1901634 (S.D.N.Y. Apr. 18,
2018), *appeal dismissed*, No. 18-1532 (2d Cir. Jan. 14,
2019) ............................................................................... 29

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ............................................. 54

*Parker v. Time Warner Entm't Co.*,
331 F.3d 13 (2d Cir. 2003) ............................................... 41

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017), *cert. dismissed sub nom.*
*Petroleo Brasileiro S.A. v. Univs. Superannuation*, 140 S.
Ct. 338 (2019) ................................................................. 33

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019) ........................................ 35, 44

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43
(2d Cir. 2016) ............................................................. *passim*

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) .................................. 21

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) ........................................ 40, 45

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Louisiana*,
806 F.3d 71 (2d Cir. 2015) ............................................ 48

*Spagnola v. Chubb Corp.*,
574 F.3d 64 (2d Cir. 2009) ............................................ 49

*Sweeney v. Kimberly-Clark Corp.*,
No. 8:14-cv-3201-T-17EAJ, 2016 WL 727173 (M.D. Fla.
Feb. 22, 2016), *order clarified*, No. 8:14-cv-3201-T-17EAJ,
2016 WL 7138530 (M.D. Fla. Mar. 3, 2016) ........................ 51

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015) ............................................ 35

*Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*,
136 A.3d 688 (Del. 2016) .............................................. 48

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d
Cir. 2000) ................................................................ 21

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) .......................................... 16

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ................................................. 16, 35

*Werdebaugh v. Blue Diamond Growers*,
No. 12-cv-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec.
15, 2014) ....................................................................................... 22

*In re Williams Sec. Litig.–WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ......................................................... 33

*In re Wireless Tel. Servs. Antitrust Litig.*,
385 F. Supp. 2d 403 (S.D.N.Y. 2005) ................................................ 20

**Rule**

Fed. R. Evid. 702 ................................................................................ 17

**Other Authorities**

Kathianne Boniello, *'Flushable' Wipes Clogging Up Drains
Citywide*, N.Y. Post (Mar. 2, 2014),
https://nypost.com/2014/03/02/flushable-wipes-clogging-
up-drains-citywide/ ........................................................................ 53

Erin Durkin, *NY Politicans* [sic] *Look to Flush Advertising
Claims of Sewer-Clogging Wet Wipes as 'Flushable*,' N.Y.
Daily News (Feb. 11, 2015),
https://www.nydailynews.com/new-york/ny-pols-flush-ad-
claims-sewer-clogging-wet-wipes-article-1.2112087 ..................... 53

Ecological Fallacy, *Encyclopedia Britannica*,
https://www.britannica.com/science/ecological-fallacy ................. 39

Fed. Jud. Ctr., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE
(3d ed. 2011) ................................................................................... 31

Sheila Anne Feeney, *'Flushable' Wipes Cause Havoc in
NYC's Plumbing and Sewer Systems*, amNewYork (Nov.
22, 2015), https://www.amny.com/news/wet-wipes-
clogging-nyc-plumbing-and-sewer-systems-1.11153775 ............... 53

1 MCLAUGHLIN ON CLASS ACTIONS (16th ed.) ........................................ 16

Oz Media LLC, *Why Is Dr. Oz Looking for the Things You Flushed? Pt 1* (originally aired Sept. 9, 2014), https://www.doctoroz.com/episode/daytime-exclusive-i-am-adam-lanzas-mother?video_id=3775552060001 ................................ 53

## PRELIMINARY STATEMENT

This Court remanded the Rule 23(b)(3) certification question due to serious concerns about whether Plaintiff Kurtz demonstrated predominance by a preponderance of the evidence. Those concerns centered on whether Kurtz could prove injury and causation with common evidence. It questioned this in part because Kurtz's putative expert, Colin Weir, had merely described an economic technique ("hedonic regression") without developing a model or applying it to the record.

On remand, Kurtz relied exclusively on the fact that Weir now has developed and run a regression model. Ironically, Weir's post-remand work makes this an even more straightforward case in which to deny certification.

First, Kurtz's expert evidence fails to establish predominance because it is inadmissible. Weir's work, *inter alia*, violated cardinal principles of regression that have led this Court and others to reject regression-based opinions. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448-50 (2d Cir. 1999); *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 398-407 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir.

2016).  The District Court ignored such authorities and what Weir actually did.

Second, even if admissible, Weir's regression does not demonstrate that *either* injury or causation can be proven with classwide evidence or otherwise satisfy predominance.  The District Court ignored causation, and it found predominance based on a bait-and-switch regarding injury. Whether because of misunderstanding or indifference given its views that pro-certification presumptions apply, the District Court concluded that Weir's model would establish injury through classwide evidence when, in fact, Weir said no such thing and did not even set-out to do anything of the sort.  Weir admitted that his model instead addressed "*damages* in the aggregate for the class" and did "not propos[e] *to* allocate [them] to individuals," *i.e.*, to show that any, let alone all, classmembers were *injured*.  Nonetheless, at Plaintiff's urging, the District Court reinvented Weir's work to declare that this *damages* model demonstrated classwide injury.  This alone requires reversal, so too do other reasons detailed below.

## STATEMENT OF THE CASE

When this Court remanded the District Court's certification of consumer classes pursuing statutory claims against Kimberly-Clark (and other manufacturers), it noted "specific concern with the Plaintiffs' proof that they can establish the injury and causation elements of their claims at trial with common evidence," and instructed "the district court [to] assess whether the Plaintiffs have 'affirmatively demonstrated … compliance' with Rule 23(b)(3)'s predominance requirement." *Kurtz v. Costco Wholesale Corp.*, 768 F. App'x 39, 40-41 (2d Cir. 2019).

Kurtz failed to address this Court's concerns on remand. Kurtz's only evidence was from his putative expert. Weir, however, created a model to address only damages, *not* classwide *injury* or any facet of causation. Consistent with its pre-remand showings, Kimberly-Clark submitted a wealth of factual and expert evidence, including on consumer research, pricing and sales, and labeling changes, that established that injury and causation cannot be proven without significant individualized inquiries. The post-remand order ignores that evidence, SPA140-171, and fails to resolve evidentiary disputes necessary to the class certification determination.

## A. Weir Testifies to His Hedonic Regression and "Aggregate" Price Premium.

After experts submitted supplemental reports (Weir submitted separate reports for Kimberly-Clark, Costco, and Procter & Gamble ("P&G"), CA1245-CA1340, A2290-A2310, the court held a four-day hearing with live testimony from Weir; Ken Champa, Kimberly-Clark's Senior Brand Manager for Cottonelle; and Drs. Keith Ugone and Denise Martin, expert economists retained by Kimberly-Clark and Costco, respectively.[1]

**Methodology and Data.** Weir's supplemental report as to Kimberly-Clark addressed a hedonic regression that purportedly determined the existence and amount of a price premium associated with "flushable" labeling claims. CA1262-CA1265_¶¶71-82. "The basic regression method is simple: isolate the effect of one variable (the 'independent variable') on another variable (the 'dependent variable') by holding all other potentially relevant variables (the 'control variables') constant. By controlling for other factors that might influence the dependent variable, one 'regresses' the influence of the independent

---

[1] Weir also offered P&G-related opinions in *Belfiore*, and Dr. Carol Scott testified as an expert for P&G.

variable on the dependent variable." *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 396 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).

Weir chose 116 flushable and non-flushable wipe products (12 brands) for his dataset. CA1258-CA1259_¶¶55, 57; A2854:18-22; A2937:10-13. Weir testified that any human hygiene wipe was eligible for inclusion. A2933:15-18. But he excluded all feminine hygiene wipes, A2957:9-10, despite that the class definition includes Kimberly-Clark's Poise and Kotex flushable feminine wipes, SPA134.

Weir included as dependent variables 14 attributes he selected years earlier in litigation not involving Kimberly-Clark, coding them "0/1" (yes/no) by product. CA1254-CA1262_¶¶37, 55-70. Weir said his attribute selection was based on product labels and whether P&G, Nice-Pak, or Kimberly-Clark employees "mentioned the attributes" when deposed. A2992:20-25. As Weir admitted, A2996:12-15, A2998:12-A3000:10, A3020:10-12, he did not review Kimberly-Clark documents reflecting what consumers said about the importance of these (or other) attributes, or Kurtz's testimony about why he bought Kimberly-Clark's flushable wipes, *see*, *e.g.*, A245__pp.58:9-24, 59:17-60:3.

Upon Kurtz's request, the Parties agreed to stipulate that Weir could rely on pricing data from IRI, a third-party market researcher, collected before his 2015 reports. A2364.  Using it, Weir's regression model used for his Kimberly-Clark-focused report showed *no* price premium associated with "flushable" labels.  CA1444-CA1448_¶¶79-83; *infra* p.24.  Plaintiffs, however, subsequently insisted on updating the IRI data, and Weir used data covering New York retail sales between February 2010 and May 2019.  CA1257_¶¶46-47, CA1263_¶75.

**Weir's Conclusions.**  Weir's Kimberly-Clark-focused report claimed an "aggregate" price premium of 6.2% associated with the "flushable" claim for *all* flushable wipes in his dataset (including but not limited to Kimberly-Clark's flushable wipes).  A2854:19-22, A3016:3-7, A3019:17-A3020:9.

Weir candidly, and repeatedly, testified that his model did not answer whether Kurtz or any other particular consumer paid more for Kimberly-Clark's flushable wipes than for comparable non-flushable wipes, but instead only measured an "*aggregate*" market-wide price premium:  "I'm focused on calculating *damages* in the aggregate for the class.  How those *damages* are ultimately apportioned to individual

6

class members does not change that calculus .... We're applying a premium in the *aggregate* to the class. I'm not proposing *to allocate to individuals* in any particular manner." CA1677:17-CA1678:9 (emphases added). "I'm not talking about what any one individual paid. I'm talking about what the class paid in the aggregate across the period that I have measured. ... I have not been asked to calculate any one individual's damages or to allocate class-wide damages to them." A2968:21-A2969:5.

Weir opined that his model's premium covered all Kimberly-Clark flushable wipes, including the omitted feminine hygiene wipes, purchased between February 21, 2008 and March 1, 2017. A3016:11-A3017:1; A2965:17-A2966:4. Weir, however, modeled a *different* period, 2010 to 2019. CA1262-CA1264_¶¶71, 75, 80; A2833:19-25, A2965:17-A2966:4. He did so despite acknowledging that changing the period can change his model's results. A2974:5-25, CA1676:12-23.

Weir did not opine on whether "flushable" labeling is accurate, but assumed its falsity. CA1247_¶6. He did not opine about what causes consumers to buy flushable wipes or how consumers choose which brand or type to purchase. A2856:13-A2857:10, A3674:24-A3675:11.

Weir conceded that regression does not demonstrate causation.

CA1253-CA-1254_¶¶31-32 (discussing "premiums *associated with*"

"product attributes" and "labeling claims") (emphasis added).

**B. Kimberly-Clark's Fact and Expert Evidence Demonstrates Flaws in Weir's Analysis.**

**1. Ken Champa.** Consistent with evidence Kimberly-Clark

produced pre- and post-remand, Champa testified, *e.g.*, Kimberly-

Clark's consumer research conducted outside of litigation showed that

different types of flushable wipes consumers emphasize different

product attributes as significant to their purchase decisions, and *all*

types of purchasers emphasize many attributes are more significant

than flushability, with cleaning ability and texture among the most

significant attributes. A3116:24-A3117:3, A3123:4-10, A3181:2-7;

CA1863-CA1865; CA1965, CA1978-CA1981. (Indeed, Kurtz originally

bought Kimberly-Clark's flushable wipes for their cleaning ability, not

their flushability, A264_p.135:12-15, and *continued* buying them for

cleaning after he stopped flushing them, SPA43, A240_p.39:8-16,

A245_p.58:5-24, 59:17-23.) Weir's model, however, did not include

cleaning ability or texture attributes. A2982:6-A2983:6, A2996:16-18,

A2998:2-4, A3000:22-A3001:2; CA1733:3-9.

Champa explained that Kimberly-Clark has prominently labeled cleaning ability and texture, increasing their prominence in the period when Weir's model first identifies a purported "flushable" premium. A3123:2-10, A3126:17-25; A2685-A2686. When Kurtz purchased, labels made cleaning ability (and other attributes) far more prominent than "flushable":



A2678.

Subsequently, Kimberly-Clark modified the Cottonelle flushable wipes' texture to improve cleaning ability and labeled those attributes equally if not more prominently than flushability:

 



A2684-A2686.

Weir ignored more than a half-dozen additional attributes that Kimberly-Clark's flushable feminine wipes labeled as or more

prominently than "flushable" (which appeared on only the package's

*backside*):





A3966; A2664.

Further, Champa testified to documents showing (i) most users

throw away flushable wipes, rather than flushing, A3132:8-9, CA1997;

(ii) roughly 40% of users do not read labels about flushability, A3132:14-

16, CA1997; and (iii) half of users would still purchase flushable wipes

after viewing news reports portraying them as *not* flushable, A3133:21-A3134:4; CA2003.

Champa testified that neither demand for nor price of Kimberly-Clark's flushable wipes fell despite negative (unsupported) media coverage about flushability. A3135:4-10. Despite that coverage, demand for Kimberly-Clark's flushable wipes has increased, as has the price (due to increased material costs and alignment of retailer pricing programs). A3096:20-A3098:9; CA1850; CA2020; CA2038. Kimberly-Clark's flushable wipes cost *twice* more to produce than its non-flushable wipes because of the proprietary materials and manufacturing that allow flushable wipes to "break down." A3101:20-A3102:6, A3103:1-10; CA1853. If Kimberly-Clark stopped using the word "flushable," these production costs would not change. A3102:3-6.

**2. Dr. Keith Ugone.** Expert economist Dr. Ugone, while recognizing that hedonic regression theoretically can be used to measure price premiums, explained the economic significance of Weir's erroneous factual suppositions and methods. Dr. Ugone testified that Weir's work implicated numerous individualized inquiries as to injury

and causation and was unreliable from an economic perspective.  *See* CA1376; A3193:12-A3194:8.

**Time Period.**  Despite that the class period is **2008 to early 2017**, Weir modeled purchases from **2010 to 2019**,[2] using that model to claim that there was a single "flushable" premium from **2008 to 2019**. CA1262_¶71; CA1432_¶63; CA1445_n.190; CA1447_¶82; A3194:25-A3202:17, A2963:4-A2965:5.  Dr. Ugone ran Weir's own model *within* the class period, establishing there was no "flushable" premium at any time between 2010 and 2016.  CA1444-CA1447_¶¶79-82; A2694-A2696. In sum: Weir found a premium *outside the class period* (2017 to 2019), combined that premium period with all purchases since 2010 to concoct an aggregate premium across the 2010-2019 dataset, then opined that the same premium applied to *another* period (2008-2017), despite lacking any data for 2008-2009.  *See also* A3200:9-A3201:7.  Had Weir used his original dataset (2010-2015), *supra* p.6, which best corresponds with Kurtz's purchases, his model would have shown *no* "flushable" premium.

---

[2] Weir did not obtain 2008-2009 data and did not say that he could. A2964:8-13.

**Omitted Attributes.** Dr. Ugone established that Weir's regression omitted many major attributes that could account for portions (or all) of the alleged "flushable" premium. CA1441-CA1442_¶74. For example, any premium that Weir associated with "flushable" was as logically traceable to texture, cleaning ability, type of usage (*e.g.*, feminine hygiene, face/hands), type of dispenser, or other attributes that Weir's model omitted. *See*, *e.g.*, A3205:24-A3208:21; A2701; *supra* pp.8-11. Indeed, Ugone demonstrated that had Weir coded whether wipes were labeled for toileting or face/hands, the face/hands attribute alone would have *eliminated* any "flushable" premium. CA1443-CA1444_¶¶77-78; A3270:14-A3273:12.

**Causation.** Ugone explained additional reasons that, even if it was completely accurate and reliable, Weir's regression could not establish classwide causation. CA1398-CA1415_¶¶26-45. For example, inquiries into an individual consumer's knowledge, perception, and behavior (including disregarding the flushable representation, as Kurtz ultimately did) were economically significant, but Weir ignored them. *Id*. Ugone also showed that any hypothesis that "flushable" representations caused higher prices was contrary to elementary

economics and created individualized inquiries over time. Specifically, while negative media attention surrounding flushable wipes increased (and hence more people became knowledgeable of their purported (albeit unsupported) flushing problems), consumer demand increased and price stayed the same or increased. CA1431-CA1436_¶¶62-68; A2711-A2712; A3134:5-A3135:14, A3211:1-A3212:23; CA1850. If "flushable" representations actually drove price, the economics of Weir's market impact theory would dictate price *decreases* as the alleged falsity of "flushable" was publicized. CA1431-CA1436¶¶62-68; A3210:8-A3212:23. But the opposite occurred.

## C. The District Court Adheres to Its Previous Rule 23(b)(3) Certification and Denies Weir's Exclusion.

After briefing and argument, the District Court denied Defendants' motions to exclude Weir and adhered to its previous Rule 23(b)(3) certification. SPA140-171. On admissibility, the court addressed only whether Weir was qualified and identified a generally accepted methodology, rather than, as *Daubert* commands, assessing whether Weir reliably applied that methodology to sufficient facts or data without making illogical leaps from the record. SPA160-163. On certification, the court ignored the above-detailed evidence, and failed to

resolve disputes about whether Weir's "aggregate" premium model could show injury and causation with predominating common, classwide evidence. Instead, the court doubled down, stating that "[i]ndividual issues do not predominate for the reasons already explained" in its *original order* granting certification. SPA166.

## ARGUMENT

## I. THE ADMISSION OF WEIR'S TESTIMONY REQUIRES REVERSAL.

The District Court committed legal errors and abused its discretion in admitting Weir's testimony. *See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002) (reviewing *Daubert* rulings for abuse of discretion); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007) (improperly applying legal standards constitutes abuse of discretion).[3]

Weir's opinions are not "based on sufficient facts or data," the "product of reliable principles and methods," or "reliabl[e] appli[cations

---

[3] Consistent with indications that Rule 702 governs expert testimony relevant to class certification, *see, e.g., Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129-30 (2d Cir. 2013); 1 MCLAUGHLIN ON CLASS ACTIONS § 3:14 (16th ed.), the Parties and the District Court agreed that the experts' testimony must satisfy Rule 702/*Daubert*. SPA159.

of] the principles and methods to the facts of this case." Fed. R. Evid. 702. In a decision excluding regression analysis-based testimony, Judge Oetken summarized how Rule 702/*Daubert* apply in this setting:

> First, to be admissible, a regression analysis must examine an appropriate selection of data. When constructing a benchmark statistic, the regression analyst may not "cherry-pick" the time-frame or data points so as to make her ultimate conclusion stronger. ...

> Second, to be admissible, a regression analysis must be the product of a consistently followed methodology. ...

> Finally, to be admissible, a regression analysis must control for the "major factors" that might influence the dependent variable. ... [A] regression that excludes "major" variables is inadmissible ....

*Reed*, 49 F. Supp. 3d at 400-01. "[I]t is the 'proponent who must establish that the major factors have been accounted for in a regression analysis.'" *Id.* at 403; *see Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448-50 (2d Cir. 1999) (affirming rejection of regression evidence).

## A. Weir's Regression Failed to Consider "Major" Product Attributes.

Weir's model purported to control for some attributes that he supposedly selected based on reviewing labels and because unidentified P&G, Nice-Pak, *or* Kimberly-Clark deponents "mentioned" them. *Supra* p.5. Weir, however, failed to account for *nine* attributes that Kimberly-

Clark's deponent identified as important to consumers.  CA2565 (third column); D.E.190-19_pp.61:8-24;89:18-92:11;112:2-13 (cleaning ability, freshness, moisture, in-use strength, hand feel, fragrance, dispenser, thickness, and texture).  Weir admittedly did not review *any* Kimberly-Clark consumer research, A2933:19-A2934:4, and therefore ignored more than a dozen attributes that Kimberly-Clark's consumers identified as important.  CA1862-1865; CA1889; CA1909; CA1932; CA2565-CA2567 (first two columns); CA1977-CA1980; A3106:15-18; *see* A2982:6-A2983:6, A2996:16-18, A2997:24-A2998:4, A3000:22-A3001:2; CA1733:3-9.

Weir's model omitted the attribute ("cleaning ability") that Kimberly-Clark's consumers (including Plaintiff Kurtz) have consistently identified as the *most important* to them.  *See*, *e.g.*, CA1863; CA1980-CA1981.  Indeed, Kurtz testified that it was cleaning ability that drove his purchases of Kimberly-Clark flushable wipes before and after he sued.  *Supra* p.8.

Likewise, Weir's model omitted a major attribute (texture) that Kimberly-Clark has twice modified to improve cleaning ability during the tail end of the modeled period (2010-2019).  A3113:19-A3114:2;

CA1993. Kimberly-Clark has concluded that its Cottonelle flushable wipes' texture differentiates them from competitors' products (A3109:6-10, A3116:24-A3117:3; CA1965, CA1989), and prominently marketed texture exactly when Weir's model suggests a "flushable" premium first developed. *Supra* pp.9-10,13; *see* A3123:2-10, A3128:17-A3130:14; A2683-A2686; A2706-A2707; CA1953 (texture and cleaning ability-focused marketing campaigns). Between 2017 and 2019, labeling highlighted "clean ripple" and then "wavy ripple" textures, while *downplaying* "flushable." *See*, *e.g.*, A3123:2-10; *supra* pp.8-10.

These two examples are merely illustrative; Weir ignored at least 19 more attributes labeled on Kimberly-Clark's flushable wipes' packages during the modeled period. CA2565-CA2567 (last column); *supra* pp.8-11. Kimberly-Clark's consumers find many of them significant. CA2565-CA2567 (first two columns summarizing CA1862-CA1865, CA1980-CA1982); *see, e.g.*, A3103:15-A3104:9, A3106:15-A3109:10, A3115:10-A3117:3.

Weir's neglect of such major attributes requires his exclusion. In *Bickerstaff*, this Court rejected expert evidence "[b]ecause the regression analysis failed to account for *the major factors* that

[defendant] considers in evaluating salary increases," whereas the plaintiff contended that the regression demonstrated discrimination. 196 F.3d at 449-50. Similarly, *Reed* excluded opinions based on a regression analysis intended to determine "the price effect" of misconduct, because of "[o]mitted-variable problems." 49 F. Supp. 3d at 397, 403. That "important control variables are left out of the model" was "fatal" because they "could explain the" prices purportedly affected. *Id.* at 403-04.

Here too, Weir's exclusion of "major factors" renders his regression analysis "meaningless," because what he contends "looks like a correlation between" price and a "flushable" representation "could just as easily be explained by" omitted major variables. *Reed*, 49 F. Supp. 3d at 403; *see, e.g., In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427-28 (S.D.N.Y. 2005) (excluding expert whose regression omitted "obvious and significant alternative explanations"). Omitted major variables may account for the entire "premium" (or more) that Weir attributes to "flushable." CA1400-CA1405_¶¶28-29 CA1441_¶74; A3205:24-A3208:21; A3961-A3966.

When questioned about his omissions, Weir declared: "I can definitely tell you that none of [the] price premium I'm speaking about today *should be attribut[able]* to those things [cleaning ability, texture, and/or thickness]." A3000:22-A3001:2 (emphasis added). Rule 702, however, forbids opinions based on "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993).

Even if rank speculation were ever permissible, it would not be here given Weir's stated methodology. He testified that it is "illogical ... that a producer" would put a representation on its labels "without some expectation that [doing so] would create some sort of value in the marketplace." A3346:21-25. Applying that principle to the facts, Weir's regression failed to value cleaning ability, texture, and at least 19 other representations on Kimberly-Clark flushable wipes labels, including those labeled more prominently than "flushable." Expert opinion "not supported by [one's] own methodology" requires exclusion. *In re TMI Litig.*, 193 F.3d 613, 677 (3d Cir. 1999); *accord Reed*, 49 F. Supp. 3d at 400-01 ("[A] regression analysis must be the product of a consistently followed methodology."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp.

2d 531, 563, n.146 (S.D.N.Y. 2004) (excluding expert who "violated his own standard of proper methodology").[4]

In denying exclusion, the District Court skipped past all of this. SPA162. It did not mention *Bickerstaff*, *Reed*, or other cases making clear that a regression's "fail[ure] to account for the major factors" requires rejection. *Bickerstaff*, 196 F.3d at 448-50. Accordingly, the court committed legal error in categorically claiming that "[a]ny objections to Weir's specific hedonic regression analyses go to weight rather than admissibility." SPA162. The court did not determine whether Weir even considered the major factors, instead noting that

---

[4] Weir also claimed that his failure to account for major factors was harmless because the "brand" attribute captured the value of every omitted attribute. A2863:3-22, A2982:6-16, A2996:16-A3002:20. Courts have rejected this proposition. *E.g.*, *Werdebaugh v. Blue Diamond Growers*, No. 12-cv-02724-LHK, 2014 WL 7148923, at *11 (N.D. Cal. Dec. 15, 2014) (decertifying class where regression conflated "brand" with "at-issue label statements"). There is no basis for claiming that "brand" would capture cleaning ability, texture, and myriad other labeled variables, but *not* flushable. Furthermore, Weir did not analyze which attributes (if any) consumers actually associate with any brand, and indeed Kimberly-Clark's research confirms that consumers distinguish "brand" from attributes that Weir ignores, including cleaning ability and texture. A3118:2-17; CA1977-CA1982. Anyhow, "brand" could not be a control because Weir's model omits various Kimberly-Clark flushable brands with *different* attributes, *supra* pp.5,8-11,19, and even within brands, attributes (*e.g.*, texture) changed during the studied period. A3115:18-22.

Weir "described this [regression] process at length, including how and why he made judgments as to ... attribute selection and definition." *Id.* That Weir described how and why he did something is a far cry from demonstrating the application of a reliable methodology to sufficient facts or data. Weir's explanation of his selection of attributes is irreconcilable with Kimberly-Clark's documentary evidence and testimony, Kurtz's testimony, the actual labels, and Weir's own stated theory. Exclusion is required.

## B. Weir's Testimony Is Inadmissible Because He Cherry-Picked Time Frames and Products.

Weir's testimony is independently inadmissible because he violated the proscription that "the regression analyst may *not 'cherry-pick' the time-frame or data points* so as to make her ultimate conclusion stronger." *Reed*, 49 F. Supp. 3d at 400 (emphasis added).

### 1. Weir Manipulated His Model's Time Frame.

Despite a certified class period of February 21, 2008 to March 1, 2017, SPA134, Weir strained to avoid running a regression for that period. A2965:17-2966:4; CA1444-CA1445_¶79 & n.190; CA1447_¶82; A3194:25-A3195:6, A3196:21-A3198:24, A3200:6-A3202:4. Instead, Weir modeled 2010 to 2019. CA1263_¶75; A2964:8-A2965:10.

When Dr. Ugone ran Weir's model across the years actually within the class period, it showed no price premium associated with "flushable" between 2010 and 2016. CA1444-CA1447_¶¶79-82; A3200:22-A3201:6; A2694-A2697. For at least seven years of the ten-year class period, or, stated differently, for *all but two months* of the class period for which data actually exists, Weir's model shows *no premium*. This includes the entire time Kurtz purchased.

In sum, Weir has taken a "flushable" premium that (even under his flawed analysis) developed and existed only from 2017 to 2019—after Kurtz (and most of the class) purchased Kimberly-Clark flushable wipes—and combined it with data for all purchases since 2010 to gin-up an "aggregate" (*i.e.*, average) premium that Weir ascribes to yet another period, the 2008-2017 class period. CA1444-CA1447_¶¶79-82; A3200:9-A3202:17.

Less blatant cherry-picking has required exclusion. The *Reed* court excluded the expert because the regression's "time frame" was "more or less, arbitrary," and "the choice of the end-date for the observations in [the] analysis has an outcome-determinative effect. [Defendant's expert] recreated [plaintiff's expert's] model but changed

the end-dates … and found that it yielded no damages." 49 F. Supp. 3d at 407. Precisely so here.

The District Court ignored this issue. At most, it deferred to Weir's bald assertion that it is "reasonable ... to apply the premium" he calculated from 2010-2019 to the 2008-2009 period for which he has *no* data. SPA154. Weir claimed it is "likely" that the premium would apply to those years, A2965:17-A2966:4, but that assumption conflicts with his model, which showed no premium for the seven years more proximate (2010-2016) than the period when the premium arose (2017-2019). A2697. Moreover, such an assumption is contrary to Weir's admissions that "I can only offer my testimony as to the portion for which I have data." A2964:25-A2965:1.[5]

---

[5] Plaintiff's post-hearing brief claimed that Weir "re-ran his regression models" from 2010 to 2017 and found a price premium. D.E.360_p.37. Putting aside that Weir had ample opportunity pre-hearing to re-run his model, this modification does not render Weir's approach acceptable because he (i) still has no data from 2008 and 2009, and (ii) is still relying on a premium that purportedly existed for *two months* within the class period (January-February 2017) to conjure a premium for 10 years.

## 2. Weir Manipulated His Dataset.

Weir should be excluded for manipulating the products in his dataset. *See*, *e.g.*, *Reed*, 49 F. Supp. 3d at 400 ("[A] regression analysis must examine an appropriate selection of data."); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1039 (C.D. Cal. 2013) (excluding expert due to "selection bias").

First, despite testifying that any human hygiene wipes were relevant benchmarks, A2933:15-18, A2958:15-19, Weir's model categorically excluded feminine hygiene wipes. A2957:9-10. Yet he claimed that his aggregate premium applied to Kimberly-Clark's Kotex and Poise flushable feminine hygiene wipes within the class definition. A3016:3-A3017:1. There is no reliable basis for doing so. Tellingly, the Poise packaging emphasizes attributes that Weir's model ignored (and buries "flushable"). *Supra* p.11.

Second, Weir excluded from the regression in his Kimberly-Clark-focused report all "private label" wipes, even though (i) they constitute one-third or more of the market, A2842:1-3, A2940:20-22, A3033:7-17, and (ii) he included them in the regression addressed in his Costco-focused report. A2842:7-10. Weir's cherry-picked dataset for the

Kimberly-Clark report includes just 32% of the products with IRI data available to him, and excludes 49 of the 100 top-selling wipes. CA1457-CA1459_¶¶87-88.

The court abused its discretion in ignoring this cherry-picking. *See* SPA162 (merely stating that Weir described "extrapolation of results to … products not included in the data"). Again, that Weir described something he did does not demonstrate Rule 702 compliance.

## C. Weir's Regression Treated Changing Variables as Constants.

Despite conducting his analysis in 2019, Weir coded the attributes in his model based on labels from 2017. A2976:2-20. He pretended that those labels and attributes were unchanged for the entire 2010-2019 modeled period and the entire 2008-2017 class period.

Weir insisted that this approach was permissible as long as the variable of interest ("flushable") was unchanged. A2850:21-23. The court deferred to Weir's *ipse dixit*, stating that accounting for changes to the various attributes "is not necessary when the attribute of interest is constant; [Weir] determined the flushable label is constant here." SPA150.

That deference is contrary to economic principles, the record, and Weir's methodology. For example, a product cannot be deemed unchanged throughout the class period if it lacked texture or had inferior cleaning ability at certain times and then *had* texture and improved cleaning ability at others, especially where marketing of those attributes changed. Notably, Kimberly-Clark significantly re-designed Cottonelle flushable wipes and its marketing of their new textures and associated cleaning ability at the very time when Weir's model finds a "flushable" premium first arose (2017-2019). *Supra* pp.8-10. That the "flushable" variable of interest supposedly did not change, SPA150, is no answer because regression measures that variable in relation to how *other* attributes (which unquestionably changed) purportedly affect price.

Moreover, the variable of interest *did* change. As Champa testified, Weir was simply wrong that "Kimberly-Clark has made no changes to flushable-related claims on packaging over the class period." A3125:25-A3127:21; A3129:11-A3130:14. Sometimes "flushable" appeared in small type, *e.g.*, A2675, A2677, A2684, but other times was printed much larger, A2683, A2686-A2687. Some labels stated

"flushable" without clarifying language, A2678, A2680-A2681, whereas others clarified or contextualized it by saying "Breaks Up After flushing," A2675-A2677, A2679, A2682, "Sewer and Septic Safe," A2683, or "SafeFlush Technology" with associated graphics varying in size and placement, A2684-A2686. Most recently, labels contextualize "flushable" with "Designed for Toilets/Tested with Plumbers" representations and graphics. A2687. Weir's violation of his own stated methodology requires exclusion. *Supra* pp.21-22 (collecting cases).

Weir's disregard of changes to the "flushable" variable also is irreconcilable with the substantive law governing Kurtz's claims. A GBL plaintiff cannot focus on one label statement while ignoring the rest, and "may not misquote or misleadingly excerpt the language of the advertisement." *Fink v. Time Warner Cable*, 714 F.3d 739, 741-42 (2d Cir. 2013) (per curiam). Rather, "context is crucial" and "a disclaimer or similar clarifying language may defeat a claim of deception." *Id.* at 742. As here, "[e]xpert testimony … should be excluded when it applies the wrong legal standard." *Olin Corp. v. Lamorak Ins. Co.*, No. 84-cv-

1968(JSR), 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018), *appeal dismissed*, No. 18-1532 (2d Cir. Jan. 14, 2019).

### D. The "Marketwide" Flushable Premium Is Not Specific to Kimberly-Clark.

Weir seeks to apply his 6.2% aggregate flushable premium to all Kimberly-Clark products in the class definition, even though that figure stems from pricing for *all* manufacturers' flushable wipes in his dataset. *See, e.g.,* SPA143 ("[T]here is a marketwide price premium for wipes labeled as flushable."), SPA153, SPA164 (similar). Weir provides no basis for ascribing that or any other premium to *Kimberly-Clark* flushable wipes, as opposed to other manufacturers'.

Consider these hypothetical wipes with two binary attributes, brand and flushability:

1. Wipes labeled "Kimberly-Clark," and "flushable" sell for $5.00.

2. Wipes labeled "Acme," and "flushable" sell for $10.10.

3. Wipes labeled "Kimberly-Clark" but *not* "flushable" sell for $5.00.

4. Wipes labeled "Acme" but *not* "flushable" sell for $10.00.

Because Weir's model measures only a "*marketwide*" premium, it would find a 5% premium for all "flushable" products. Weir would ascribe that

premium to Kimberly-Clark, despite that, as shown, Kimberly-Clark has no overall "flushable" premium and its "flushable" wipes are *discounted* from Acme's non-flushable wipes.

Because Weir's model never isolates a premium for *any* Kimberly-Clark flushable wipes (let alone all) but would hold Kimberly-Clark liable for other manufacturers' conduct, any opinion about Kimberly-Clark is inadmissible. *See, e.g.*, *Amorgianos*, 303 F.3d at 270 (excluding expert where "the analytical gap between the studies on which she relied and her conclusions was simply too great and ... her opinion was thus unreliable").

### E.    Any Causation Testimony Is Inadmissible.

Weir concedes that economists use hedonic regression to show associations, not causation or causation from deception. CA1253-CA1254 ¶¶31, 32 ("premiums *associated with*" "product attributes" and "labeling claims") (emphasis added).  But "association is not causation," Fed. Jud. Ctr., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 220 (3d ed. 2011); *id.* at 552-53, and Weir could not articulate any basis for a causation conclusion.  He testified circularly that any attempt to move from "correlation to causation" would be based on "plaintiff's theory."

A2917:5-12.  He added that a causal hypothesis would be based on unidentified "corporate witness testimony about the importance of the flushable attribute [and] about the nature of the product category," and an undefined "understanding about how companies design and execute labels in order to increase their sales." A2917:10-19.  He gave this testimony while ignoring the evidence that Kimberly-Clark does not link the prices it charges to its "flushable" claim.  A3013:24-A3104:10, A3121:5-A3123:20, A3135:4-15, A3181:2-15; CA1978-CA1981.

In all events, any opinion that "flushable"-related deception caused marketwide price impact would be inadmissible because Weir ignored the record showing what the market actually knew and that price and demand increased despite increased negative media coverage. *Supra* pp.12,15, *infra* pp.51-54.  Those effects are directly contrary to what settled economics would dictate.  A3210:8-A3212:23; CA1431-CA1435¶¶62-67.  Testimony is routinely excluded in the face of such failings. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 94-95 (1st Cir. 2014) (excluding expert who ignored "information previously disclosed that, under an efficient market theory, would have already been incorporated into …

price"); *In re Williams Sec. Litig.–WCG Subclass*, 558 F.3d 1130, 1137-43 (10th Cir. 2009) (similar); *Reed*, 49 F. Supp. 3d at 401-02.

Finally, Weir proffered no basis on which to opine that purchases could be causally linked to "flushable" representations classwide. Weir's model, contrary to governing substantive law, disregarded whether individual consumers saw various flushable representations at issue. *Supra* p.11 & *infra* pp.49-50. Moreover, Weir ignored, *inter alia*, Kimberly-Clark's consumer research showing that many consumers purchase Kimberly-Clark flushable wipes irrespective of their flushable claims, and, like Kurtz, purchase even after concluding (wrongly) that "flushable" was untrue. A3132:6-12-A3134:4; SPA43.

## II. THE COURT ERRED IN HOLDING THAT KURTZ SATISFIED RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT THROUGH WEIR.

In adhering to its pre-remand conclusion that Plaintiff satisfied predominance, SPA163-168, the District Court erred in tacitly finding both aspects of predominance met: "(1) resolution of any material 'legal or factual questions can be achieved through generalized proof,' and (2) 'these common issues are more substantial than the issues subject only to individualized proof.'" *In re Petrobras Sec.*, 862 F.3d 250, 270 (2d Cir.

2017) (alterations omitted), *cert. dismissed sub nom.*, 140 S. Ct. 338 (2019).  Even if admitted, Weir's testimony (Kurtz's only basis for establishing predominance) does not satisfy either requirement.

This Court instructed Judge Weinstein to "assess whether the Plaintiffs have 'affirmatively demonstrated [their] compliance' with Rule 23(b)(3)'s predominance requirement," and to consider its "specific concern with the Plaintiffs' proof that they can establish the *injury* and *causation* elements of their claims at trial with common evidence." *Kurtz*, 768 F. App'x at 410 (emphases added).  The District Court did no such analysis, and committed multiple reversible errors.

At the threshold, reversal remains required on Kimberly-Clark's pre-remand showings that the District Court committed legal errors. Orig.-K-C Br.24-28 [Doc.133].  On remand, the District Court did not remedy those errors, but exacerbated them by (i) incorporating its original decision by reference, SPA164, SPA166, and (ii) failing to resolve evidentiary disputes about whether Weir's methods, in fact, establish injury and causation through generalized proof that predominates over individualized inquiries Kimberly-Clark identified, *see infra* §II.A.2; Costco Post-Remand-Br.25-40.  Without its legally

erroneous "preference" for certification and "liberal[]" pro-certification standards, Orig.-K-C Br.24-28, the court could not have again so cursorily dispensed with predominance.

Even absent these threshold legal errors, the court's abuse of discretion is clear.

### A. The Court Erred in Concluding that Weir Can Demonstrate *Injury* Through Common Proof Without Significant Individualized Inquiries.

#### 1. The Court Erred in Finding Weir's Aggregate *Damages* Model Capable of Establishing Classwide *Injury* and Predominance.

To establish predominance, plaintiffs must demonstrate that "class members have suffered the same injury," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011), and "that they can prove, through common evidence, that all class members were … injured." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (citation omitted); *see, e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227-30 (2d Cir. 2008) (lack of classwide injury defeats predominance), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623-24 (D.C. Cir. 2019) (rejecting predominance where model

did not show that each class-member was injured); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 55 (1st Cir. 2018) (similar).

Weir's regression analysis failed to do so, because it admittedly was designed to address "*damages* in the aggregate for the class," *supra* p.6-7, not classwide *injury*. The model does not show individual class-member injury or identify which class-members were injured *vel non*. *Supra* pp.6-7. "[My model] acknowledges that there are different prices being paid [by different consumers] and that, *nonetheless*, over the course of the class period, *in the aggregate* there is a price premium for the flushable wipes." A3019:18-21 (emphases added). He repeatedly emphasized these limitations:

- "I'm not talking about what any one individual paid. I'm talking about *what the class paid in the aggregate* across the period that I have measured." A2968:21-23;

- "[My models] are intended to be class wide *aggregate measures of the market price premium*." A2859:10-11;

- "I'm not giving 6.2 percent [price premium] to any individuals, I'm suggesting that that's the appropriate amount to be deemed the *classwide harm in the aggregate* across the class period." A3020:7-9. (All emphases added.)

Therefore, Weir's model says *nothing* about whether Kurtz or any other individual paid a premium for "flushable" representations—*i.e.*,

were injured—let alone that *all* consumers did so.  But such proof is what Rule 23 and due process demand.

The fact that Weir "nonetheless" purportedly found "*in the aggregate*" (*i.e.*, on average across a group) that consumers paid a premium across all the flushable wipes in his model does not cure the injury-related failure.  A3019:17-21.  It confirms the deficiency.  As Weir admitted, he really gave "damages" opinions, not injury ones.  *Supra* pp.6-7, 35-36.  But Plaintiff disingenuously encouraged the District Court to pretend that these were opinions about injury, *i.e.*, that the "aggregate" or "average" was anything but and instead meant that *every* consumer had paid too much.  Reversal is required because the District Court took the bait.  SPA166 (claiming that it was "[o]f no consequence ... that Plaintiffs have not demonstrated that any single consumer was injured" because "Plaintiffs have submitted proof that *every consumer* paid a percentage amount more for wipes labeled flushable") (emphasis added).

This Court should join its sister circuits in denying certification precisely because "[a]verages or community-wide estimations would not be probative of any individual's claim."  *Gates v. Rohm & Haas Co.*, 655

F.3d 255, 266 (3d Cir. 2011); *see, e.g., Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 343 (4th Cir. 1998) (rejecting an "abstract analysis of averages" that did "not attempt[] to calculate the damages that any individual franchisee has suffered").

Such holdings follow inexorably from the fact that conclusions stated as "averages" encompass figures above and below the mean. A model that averages prices and premiums will sweep up consumers who paid no premium and those who did. As Weir conceded, the products sold at "different prices," and his model does not address what any "one individual paid." A2968:21-A2969:5, A3019:17-21.[6] Indeed, some consumers may well have paid less for flushable wipes they purchased than any available comparator product not labeled as flushable. CA1428-CA1431__¶¶58-61. Those consumers' claims would fail for lack of injury.

---

[6] Weir's concessions aside, Plaintiffs failed to show an efficient market for flushable wipes. The markets for consumer goods are not efficient. *McLaughlin*, 522 F.3d at 224. Yet a "marketwide impact on price" theory, A2885:12, doesn't make sense without an efficient market. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283 (2014); *McLaughlin,* 522 F.3d at 224.

Neither the court nor Plaintiff had any serious rejoinder. Weir's response was to talk about aggregated "damages," when classwide "injury" is the issue. And the court's only response was to assume that because Weir testified to a small average premium (as shown above and below, the most half-baked aggregate premium imaginable), all consumers must have paid such a premium. This is called the fallacy of the average or an ecological fallacy, *i.e.*, the "failure in reasoning that arises when an inference is made about an individual based on aggregate data for a group." Ecological Fallacy, *Encyclopedia Britannica*, https://www.britannica.com/science/ecological-fallacy.

The fallacy and its repercussions are dramatic here. If, for example, *non*-flushable wipes sell for $1.00, and Set A contains 1,000 consumers who each purchased otherwise identical wipes labeled "flushable" for $1.00, while Set B contains 100 consumers who each purchased otherwise identical wipes labeled "flushable" for $2.50, Weir's model would still find a 13.6% *aggregate* "flushable" premium. By the District Court's lights, Weir's method would show that everyone in Sets A *and* B was harmed. But nobody in Set A paid a "flushable"

premium, and Set A purchased ten times more flushable wipes than Set B.

If this were only a "damages" theory—as Weir admitted his method was—perhaps its rough justice could be overlooked.[7] *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015) (discussing predominance and damages). A judgment would disgorge 13.6% of the aggregate price paid, and defendant would be no worse off regardless of how that 13.6% was distributed. But as an "injury" theory—for which the District Court allowed Weir's damages method to substitute—the result is intolerable jurisprudentially and equitably. Using the just-noted hypothetical, the theory says there are 1,100 injured class members but there are only 100. Under the $50 per purchase statutory damages theory on which certification rested, defendant would owe $55,000, with $50,000 due to *uninjured* individuals in Set A, whereas defendant should pay only $5,000 for the relatively small number of injured individuals in Set B. This alone requires reversal under Rule 23. So too to avoid the due process violation posed by application of this

---

[7] At least had Weir's aggregate premium not encompassed damages outside the class period, which Weir's model does. *Supra* p.13.

methodology given how statutory damages would be multiplied by many millions of total purchases.  *See Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 22 (2d Cir. 2003).

Moreover, because the model covers *all* flushable wipes in the dataset, Weir's opinion is doubly flawed as a basis for determining whether consumers paid a premium for *Kimberly-Clark's* flushable wipes.  Weir's model will hold a defendant liable to consumers who paid no premium and for premiums paid for non-parties' products.  *Supra* pp.23-25,30-31.  Judge Weinstein never attempted to reconcile this problem with Rule 23's requirements, despite acknowledging that "Weir generated an average relationship between price and the flushable label across the market, unrelated to any particular defendant's product or conduct."  SPA166.  The court abused its discretion in finding predominance.

### 2. Even if Weir's Model Spoke to Injury, It Implicates Numerous Individualized Issues.

Even if Weir's "aggregate" premium model addressed *injury*, it would still present individualized issues that defeat predominance. Judge Weinstein glossed over these problems, claiming that "[i]ndividual issues do not predominate for the reasons already

explained" in his pre-remand order, "*Kurtz*, 321 F.R.D. at 547-52."

SPA166.  Weir's model *on remand*, however, created these issues.

Regardless, the court made no attempt to "analyze rigorously the

conflicting evidence before it and resolve the material disputed facts."

*Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 21 (2d Cir. 2013)

(vacating certification where court failed to do so).

> ### a.    Weir's Model Implicates Individualized Inquiries About Time of Purchase and Which Products Were Purchased.

First, because Weir's model shows no statistically significant

"flushable" premium for seven years (2010-2016) of a ten-year class

period, and has no data for 2008-2009, it implicates individualized

issues as to consumer purchases.  Kimberly-Clark has individualized

defenses to claims by consumers, like Kurtz, who bought only in the

years before Weir's model first yields any "aggregate" premium, and

different defenses to purchases in 2008-2009.  That the model shows *no*

"aggregate" premium during Kurtz's period of purchase makes him

uninjured and without standing even under the damages-cum-injury

theory the court endorsed.  *See Lewis v. Casey*, 518 U.S. 343, 357 (1996)

(class representatives must "personally have been injured").  This

feature of Weir's model, which the court ignored, is a sufficient basis for reversal.

Even if Kurtz had standing, a theory that will require individualized inquiries to exclude *seven years* of uninjured purchasers does not satisfy Rule 23. *See*, *e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("The class must ... be defined in such a way that anyone within it would have standing.").

Second, similarly, Weir's model implicates individual inquiries into *which* Kimberly-Clark flushable wipes were purchased. Despite Weir's assertion that Poise and Kotex consumers paid a premium, neither product was part of his dataset. *Supra* p.5,26. Without any data about those products, there is no common evidence to show classwide injury to Kimberly-Clark consumers. Instead, individualized evidence will be needed to determine not only which class members purchased Poise and Kotex, but also whether they were purportedly sold at a flushable-related premium, especially given the product-specific features (*e.g.*, manner of use, feminine hygiene-specific marketing) that Weir's model ignores.

Faced with such "arguments that there are individualized issues of when or where a consumer made her purchase," Judge Weinstein flatly "rejected" them, citing his *pre-remand opinion* for the proposition that "Plaintiffs need not prove exactly what their damages will be." SPA167 (citing SPA124). Besides erroneously conflating injury with damages, *supra* §II.A.1, this ignores that courts have *denied* class certification under similar circumstances. *See, e.g.*, *Rail Freight Fuel Surcharge*, 934 F.3d at 625-26 (denying Rule 23(b)(3) certification because there were thousands of "concededly uninjured individuals" under plaintiffs' model); *Asacol*, 907 F.3d at 53-54 (denying certification because injury would be individualized: "[A]ny class member may be uninjured, and there are apparently thousands who in fact suffered no injury. The need to identify those individuals will predominate and render an adjudication unmanageable."); *McLaughlin*, 522 F.3d at 227-30.

> **b. Weir's Model Presents Insurmountable *Comcast*-Like Problems Given Changed Flushable-Related Representations and Performance.**

The court also erred in finding that Plaintiff's reliance on Weir met the requirements for certification post-*Comcast Corp. v. Behrend*,

569 U.S. 27 (2013).  *Comcast* reversed Rule 23(b)(3) certification because the expert's methodology measured damages from four different theories of antitrust injury, *id.* at 31-32, rather than "only those damages attributable" to the one "particular antitrust injury" on which any classwide liability was premised, *id.* at 35-36.

First, Weir's approach fails to satisfy *Comcast* because it does not match Plaintiff's theory of liability.  *Id.* at 37.  Weir's model yields an aggregate premium based on *other manufacturers'* flushable wipes, *supra* pp.30-31, whereas Kurtz may recover based on only *Kimberly-Clark's* flushable wipes.  Indeed, Weir's methodology is more problematic than that in *Comcast* because Plaintiff needs Weir to show classwide *injury*, whereas *Comcast* involved efforts to show classwide *damages* once injury was demonstrated using classwide evidence.  *See* 569 U.S. at 30-32.  The difference is significant because Second Circuit law post-*Comcast* has a greater tolerance for individual issues related to damages than to injury.  *See Roach*, 778 F.3d at 402.

Second, even if Weir's model specifically addressed Kimberly-Clark's flushable wipes, given their labeling changes and product performance changes over time, it still would be at war with Plaintiff's

overall liability theories and stands to capture "injuries" unrelated to any deception ultimately proven. Judge Weinstein previously recognized that there are many definitions of flushable, SPA59-65, and Plaintiff complains about *different* flushability representations, not all of which appeared on the same Kimberly-Clark labels, *see* A67_¶14 ("flushable," "break up after flushing," "sewer-and septic-safe"); A69_¶20 ("break up quickly after flushing"), as well as implied representations not on any labels, *see* A419-420_¶¶5-16 (asserting deception because wipes supposedly do not break-up within home drainlines).

Weir's analysis does not consider these differences or the different deception outcomes that may result from how "flushable" is represented and clarified on particular labels. Consequently, Weir's model is inconsistent with Plaintiff's deception theories and with the substantive law governing Plaintiff's claims of deception. *See supra* p.29 (discussing *Fink*, 714 F.3d at 741-42). For example, hypothetically, Kurtz may prove deception based on a "breaks up after flushing" label (which was in effect at certain times when he purchased), but under Weir's own model there's *no premium* when such representations were on the label.

Rather, the premium stems from a period (2017-2019) after Kurtz stopped purchasing and when*, e.g.*, clarifying "SafeFlush Technology" *or* "Tested with Plumbers" representations and graphics appeared, *supra* pp.9-10,13. Those clarifications were absent when Kurtz purchased (and may not result in deception claims). The model is unfit for proving classwide injury.

Different labels aside, Weir's model would treat "injury" as static despite that Plaintiff contends that Kimberly-Clark's products' flushable performance changed over time. A3114:10-20. *Plaintiff's* witness said in 2013 that he found the then-current version of Kimberly-Clark's products "flushable" (as opposed to prior versions), A458, and attested in 2014—when some labels said "sewer and septic safe"—"the Kimberly Clark Products are ... the only ones I would consider safe for the municipal sewers," A359. Class-members like Kurtz who purchased then cannot benefit from an "injury" suffered by Plaintiffs allegedly deceived by other formulations with different flushability performance. *Comcast*, 569 U.S. at 37.

**B. Reversal Also Is Required Because Weir's Model Cannot Demonstrate *Causation* Through Common Proof Without Significant Individualized Inquiries.**

Ignoring this Court's "specific concern" about Kurtz's ability to "establish ... causation ... with common evidence," *Kurtz*, 768 F. App'x at 40, Judge Weinstein did not conclude that Plaintiff could do so. With good reason: Weir's model did not demonstrate that *two* aspects of proximate causation can be established classwide and satisfy predominance. *See*, *e.g.*, *McLaughlin*, 522 F.3d at 226-27 (individualized causation issues defeat predominance).

As to the first aspect of causation, a N.Y. GBL claim fails where plaintiffs (i) did not see the specific representation at issue, *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 172 A.D.3d 405, 406 (1st Dep't 2019); *Gale v. IBM Corp.*, 9 A.D.3d 446, 447 (2d Dep't 2004), or (ii) disregarded the allegedly deceptive representation by choosing to purchase the product notwithstanding knowledge that the representation was false. *Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*, 136 A.3d 688, 696 (Del. 2016); *see generally Sergeants Benevolent Ass'n Health & Welfare Fund v. Louisiana*, 806 F.3d 71, 87 (2d Cir. 2015) ("if the person

who was allegedly deceived by the misrepresentation … would have acted in the same way regardless of the misrepresentation, then the misrepresentation cannot be a but-for, much less proximate, cause of the plaintiffs' injury").

As to the second aspect of causation, plaintiffs must show that deception caused the higher price, and was not merely associated with that price. To hold otherwise would eviscerate the rule that deception alone does not equal injury. *See, e.g.*, *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).

> ### 1. Weir Assumes Causation Rather Than Establishing It Through Classwide Evidence.

Rather than using his model to opine on causation, Weir has consistently *assumed* that a consumer's purchase has a causal link to the alleged deception by relying on the Complaint's allegations. CA1247_¶8 ("Plaintiff further alleges that consumers would not purchase the Products if the 'flushable' claim was known to be false."). Weir *admitted* that his model captures consumers who did not "see the [flushable] claim" before purchasing, and thus have no GBL claim. A2887:5-8; *see* A2981:8-13 ("Q. … [I]t doesn't matter to you whether

anyone even read 'flushable'?  A. So as to any one individual, I don't care.").  Weir's admissions alone are dispositive.

Furthermore, Weir and the court ignored an extensive evidentiary record contrary to Weir's assumptions.  The court stated that "[n]o field work demonstrates, at this point in the litigation, what percentage of consumers who buy Defendants' wipes use them for something other than toileting purposes or use wipes for toileting purposes but do not flush them."  SPA166 (acknowledging "[s]uch evidence might be useful").  This ignores Kimberly-Clark's "field work" in the form of consumer studies, testimony, and other evidence demonstrating, *inter alia*, the percentages of consumers who use wipes for other purposes or do not flush.  *Supra* pp.8-12.  As Champa testified, Kimberly-Clark's consumer research has long shown that the majority of consumers throw flushable wipes in the trash, rather than flush them, and thus purchase Kimberly-Clark flushable wipes irrespective of their flushable claims.  *Supra* p.11-12.

Indeed, Kurtz continued to purchase flushable wipes even after he concluded the flushable claim was supposedly false, using them not only for toileting but also "as a substitute for tissues, to cleanup a spill or a

mess" and throwing them away instead of flushing them. A240_p.39:8-16, A244_p.55:13-24, A245_p.58:5-24; SPA43.  Similarly, Kimberly-Clark explained to the court (A4062:1-9) that even after concluding that its flushable wipes are not "flushable" and supposedly "more expensive" than non-flushable products, other consumers continued to purchase flushable wipes to "discard … into the garbage can" "because '[t]he flushable wipes are smaller and more aesthetically pleasing and come in a smaller container which is more appropriate for the bathroom environment.'" *Sweeney v. Kimberly-Clark Corp.*, No. 8:14-cv-3201-T-17EAJ, 2016 WL 727173, at \*3 (M.D. Fla. Feb. 22, 2016).

This is precisely the type of "field work" the court (correctly) thought was relevant but ignored.  It is direct evidence that many individual consumers' purchases cannot be casually linked to alleged deception, and the court found predominance without reconciling such evidence with a model that ignored it.

### 2. Association With Higher Price Is Not Causation, And Weir Ignores Actual Evidence Regarding Lack of Causation.

Even if Weir's model addressed only Kimberly-Clark's flushable wipes (it doesn't), individualized evidence bears on linking a particular

Kimberly-Clark "flushable" label and any premium an individual consumer supposedly paid. At most, Weir's model shows that flushable labeling was *associated* with an aggregate premium over a 10-year period, *supra* pp.6-8, but that says nothing about whether a flushable representation—actually, different flushable representations—caused a premium during a specific period of purchase like Kurtz's or caused a premium on particular purchases.

Moreover, Weir's invocation of fraud-on-the-market principles does not save predominance. A2885:11-17. Had the market only known of the alleged "flushable" deception, Weir says, it would have caused prices to fall by 6.2%. Yet Weir ignores the market's evolving knowledge, and the Court disregarded Weir's failure and the individualized issues it presents. SPA167.

For example, even if a premium existed during 2008-2010, a consumer who purchased flushable wipes then, before negative media attention, would have a markedly different price impact claim than a consumer who purchased in 2013 after the *New York Magazine* article cited in Kurtz's complaint (A82-A83_¶¶56-58) castigated flushable wipes as non-flushable. More individualized issues exist for purchases

after the *New York Post*'s 2014 headline, characterizing *this litigation*, that "'[f]lushable' wipes [are] clogging up drains citywide," https://nypost.com/2014/03/02/flushable-wipes-clogging-up-drains-citywide/, and Dr. Oz said "flushable wipes ... may not be so flushable after all." *Why Is Dr. Oz Looking for the Things You Flushed? Pt 1*, https://www.doctoroz.com/episode/daytime-exclusive-i-am-adam-lanzas-mother?video_id=3775552060001.  Individualized issues compound for consumers who purchased after the *NY Daily News* said in 2015 that the City Council sought to "ban advertising … moist toilet wipes as 'flushable,'" https://www.nydailynews.com/new-york/ny-pols-flush-ad-claims-sewer-clogging-wet-wipes-article-1.2112087, and after *amNew York* said that "'[f]lushable' wipes cause havoc in NYC's plumbing and sewer systems," https://www.amny.com/news/wet-wipes-clogging-nyc-plumbing-and-sewer-systems-1.11153775.  By late 2016, Kimberly-Clark had apprised retailers, who actually set consumer price, about such negative publicity.  CA2020; *see also* A2710-A2712; A3135:19-A3137:16.

Nonetheless, consumers' demand for Kimberly-Clark flushable wipes *increased* and continues to increase, A3135:4-10, A3136:8-3137:9;

CA2020, Kimberly-Clark flushable wipe purchasers remain loyal year-over-year, A3141:6-19; CA2020, and—most perversely given Weir's fraud-on-the-market theory—Weir's model shows consumers paid *more* for "flushable" in 2017-2019, when the market had the most knowledge.

Public knowledge is critical to any price impact theory. *See*, *e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010). If Plaintiff's causation theories held—*i.e.*, deceptive flushable representations were (i) widely influencing consumer purchases and (ii) artificially driving up the price—demand *and price* would have fallen over time. Judge Weinstein never squared up the individualized issues created by this disconnect between Weir's marketwide price impact theory (had consumers known the "truth" about the flushable representations, then retail prices would have fallen) and the different information on the market at different points in time.

## CONCLUSION

For the reasons shown above, Weir's testimony was inadmissible. Even if that testimony was admissible, class certification should be reversed for the reasons shown above and by Defendants prior to remand.

January 10, 2020

Respectfully submitted,

/s/ *Eamon P. Joyce*

Eamon P. Joyce
ejoyce@sidley.com
Kwaku A. Akowuah
kakowuah@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Fax: (212) 839-5599

Kara L. McCall
kmccall@sidley.com
Daniel A. Spira
dspira@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Fax: (312) 853-7036

*Attorneys for Kimberly-Clark Corporation*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation as set forth in the order of the United States Court of Appeals for the Second Circuit, permitting the parties to submit supplemental briefs not exceeding 9,000 words, No. 17-1856, ECF No. 232 (Nov. 12, 2019), and this brief contains 8,999 words, excluding the items exempted by Rule 32(f). This brief otherwise complies with Local Rule 32.1.

This brief complies with the typeface requirements of Federal Rule of Appellate procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2016 in a 14-point Century Schoolbook font.

/s/ *Eamon P. Joyce*
Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Tel.: (212) 839-5300
Fax: (212) 839-5599
ejoyce@sidley.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2020, I caused the foregoing brief to be served on all registered counsel through the Court's CM/ECF system.

/s/ *Eamon P. Joyce*
Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Tel.: (212) 839-5300
Fax: (212) 839-5599
ejoyce@sidley.com

# SPECIAL APPENDIX

**i**

## TABLE OF CONTENTS

**Page**

Memorandum & Order Certifying Class Actions
   (March 27, 2017) .................................................. SPA-1

N.Y. Gen. Bus. Law § 349 ......................................... SPA-136

N.Y. Gen. Bus. Law § 350......................................... SPA-138

N.Y. Gen. Bus. Law § 350-e..................................... SPA-139

Memorandum & Order on Remand
   (October 25, 2019)................................................. SPA-140

SPA-140

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| D. JOSEPH KURTZ, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　– against –<br><br>KIMBERLY-CLARK CORPORATION & COSTCO WHOLESALE CORPORATION,<br><br>　　　　　　　　　Defendants. | **MEMORANDUM & ORDER ON REMAND**<br><br><br>14-CV-1142 |
| ANTHONY BELFIORE, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　– against –<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>　　　　　　　　　Defendant. | 14-CV-4090 |

**Parties:**

For Plaintiff D. Joseph Kurtz

For Plaintiff Anthony Belfiore

**Appearances:**

Mark S. Reich
Vincent Serra
Magdalene Economou
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747

Lester L. Levy
Matthew Insley-Pruitt
Sean M. Zaroogian
Wolf Popper LLP
845 Third Avenue
New York, NY 10022

For Defendant Kimberly-Clark Corporation

Eamon Paul Joyce
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

Kara L. McCall
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

For Defendant Costco Wholesale Corporation

James M. Bergin
Adam J. Hunt
Morison & Foerster LLP
250 West 55th Street
New York, NY 10019

Brian R. Matsui
Morrison & Foerster LLP
2000 Pennsylvania Avenue NW
Washington, DC 20006

For Defendant The Procter & Gamble Company

Harold P. Weinberger
Eileen M. Patt
Ryan Gander
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Cortlin H. Lannin
Covington & Burling LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105

2

**JACK B. WEINSTEIN, Senior United States District Judge:**

I. Introduction ................................................................................................................... 1

II. Background .................................................................................................................... 3

    A.        Plaintiffs and Their Claims................................................................................ 3

    B.        March 2017 Class Certification Decision and Subsequent Appeal.............................. 4

    C.        Remand to District Court; Subsequent Proceedings; Experts ..................................... 5

       1.       Colin B. Weir....................................................................................... 6

       2.       Dr. Keith R. Ugone .......................................................................... 14

       3.       Dr. Denise Martin ............................................................................. 16

       4.       Dr. Carol A. Scott ............................................................................ 17

III. Admissibility of Expert Testimony............................................................................ 18

    A.        Colin B. Weir................................................................................................. 19

    B.        Dr. Keith Ugone ........................................................................................... 22

IV. Predominance .............................................................................................................. 22

V. Conclusion .................................................................................................................. 27

### I. Introduction

Widely scattered about the country, individual consumers and other actors, including municipalities, have sued the retailers and manufacturers of "flushable" toilet wipes—moist towelettes intended for use in place of, or in addition to, toilet paper.  They allege that the toilet wipes are not flushable as advertised.

In the present litigation, plaintiffs are consumers.  Plaintiff Kurtz and Plaintiff Belfiore (collectively, "Plaintiffs") brought suit against Kimberly-Clark Corporation ("Kimberly-Clark"), Costco Wholesale Corporation ("Costco"), and The Procter & Gamble Company ("Procter & Gamble," and collectively with Kimberly-Clark and Costco, "Defendants") in 2014, alleging a host of causes of action.

In December 2017, this court certified injunctive relief and damages classes of New York consumers who alleged a violation of New York State consumer law.  Defendants appealed.

1

After briefing and oral argument, the Court of Appeals for the Second Circuit remanded a critical damages issue to this court:

> In particular, we note our specific concern with the Plaintiffs' proof that they can establish the injury and causation elements of their claims at trial with common evidence. . . . On remand, the district court should offer the parties the opportunity to submit additional evidence and should then assess whether the Plaintiffs have 'affirmatively demonstrated [their] compliance' with Rule 23(b)(3)'s predominance requirement. . . . After further review of the record, the district court should choose whether to decertify the damages classes or maintain the current certification orders.

*Kurtz v. Costco Wholesale Corp.*, 768 F. App'x 39, 41 (2d Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (alteration in original)).

This court, having held substantial post-mandate evidentiary hearings with extensive evidence and briefs, concludes that its current certification orders are appropriate.

Plaintiffs prepared and provided to this court expert reports opining that there is a marketwide price premium for wipes labeled as flushable. Their expert developed and performed hedonic regression analyses to arrive at this conclusion. Each of Defendants' experts has advanced a litany of alleged problems with Plaintiffs' expert's regression theory and his actual computation, including his attempts to meet Defendants' experts' criticisms.

The post-mandate evidentiary hearing was conducted over four days, during which four experts testified. Plaintiffs' expert was credible and demonstrated his methodology to be reliable. Defendants' experts' criticisms were unpersuasive as to the issue before the court—whether Plaintiffs can demonstrate causation and injury by common evidence.

Following post-hearing briefing and oral argument, the parties' motions to exclude opponents' experts are rejected under the Federal Rules of Evidence. As to the class certification issue, Plaintiffs have met their burden and demonstrated that the injury and causation elements of their claims can be proven with common evidence.

SPA-144

Individual issues are not a basis for denying certification.  Common issues predominate.
This court renews its prior certification of the classes under Federal Rule of Civil Procedure
23(b)(3) for the reasons set out below.

## II. Background

### A. Plaintiffs and Their Claims

The facts underlying these litigations are discussed at length in the court's decision
certifying the classes.  *See Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 508–20 (E.D.N.Y.
2017).  In sum, Plaintiffs Belfiore and Kurtz allege that they purchased flushable toilet wipes
manufactured or sold by Defendants that are not flushable even though they are advertised and
labeled as having the characteristic of flushability.  *Id.* at 493.  Plaintiff Belfiore purchased
Charmin Freshmates, manufactured by Defendant Procter & Gamble.  *Id.* at 508.  Plaintiff Kurtz
purchased Defendant Kimberly-Clark's Cottonelle wipes and Defendant Costco's Kirkland
flushable wipes.  *Id.*  Plaintiffs claim that they paid more than they should have for the wipes
because they were advertised as being flushable and are not.  *Id.* at 493.

At this juncture of the litigation, at issue are claims brought under New York's consumer
protection statutes, General Business Law Sections 349 and 350.  *Id.* at 525–26.  New York
General Business Law Section 349 prohibits deceptive acts in the conduct of any business, trade,
or commerce.  N.Y. Gen. Bus. Law § 349(a).  New York General Business Law Section 350
prohibits false advertising in the conduct of any business, trade, or commerce.  *Id.* § 350.  For
their claims to succeed, Plaintiffs must prove that each defendant has engaged in consumer-
oriented conduct that is materially misleading and that they suffered an injury as a result.  *Koch
v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012); *City of New York v. Smokes-
Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009); *see also In re Scotts EZ Seed Litig.*, 304
F.R.D. 397, 409 (S.D.N.Y. 2015).  Conduct is materially misleading if it makes representations

3

or omissions that are "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598, 604 (N.Y. 1999) (internal quotation marks and citations omitted); *see also Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).

Suit was also brought under New York State common law.  These claims are irrelevant for purposes of class certification.

**B.  March 2017 Class Certification Decision and Subsequent Appeal**

Following extensive briefing and multiple hearings, in 2017, this court certified three classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3):

1. "All persons and entities who purchased Charmin Freshmates in the State of New York between May 23, 2011 and March 1, 2017."  *Kurtz*, 321 F.R.D. at 554–55.

2. "All persons and entities who purchased Kimberly-Clark Flushable Products in the State of New York between February 21, 2008 and March 1, 2017."  *Id.* at 555. "Kimberly-Clark Flushable Wipes" are flushable, moist wipe products sold under the Cottonelle, Scott, Huggies, PullUps, U by Kotex, and Poise brands.  *Id.* at 527.

3. "All persons and entities who purchased Kirkland Signature Flushable Wipes in the State of New York between July 1, 2011 and March 1, 2017."  *Id.* at 555.

This court concluded that the requirements of Rules 23(b)(2) and 23(b)(3) were met.  *Id.* at 527–54.  The decision was made, in part, in reliance on Plaintiffs' expert Colin B. Weir's reports explaining his price premium damages model, which relied on a hedonic regression analysis.  *Id.* at 550 ("The defendants challenge Mr. Weir's premium damages model as insufficient to establish classwide injury or causation. . . .  The model is sufficient for certification." (internal citations omitted)).

4

An interlocutory appeal was filed.  Defendants argued, among other matters, that

Plaintiffs had not met their burden of showing that common issues will predominate because

they had not demonstrated that they can establish injury and causation by common proof.  *Kurtz*,

768 F. App'x at 40.  In particular, Defendants contended that Plaintiffs' allegation that Weir

could prove causation and injury using a hedonic regression analysis—common evidence—was

not sufficient proof of compliance with Rule 23(b)(3)'s predominance requirement that questions

of law or fact common to class members predominate over any questions affecting only

individual class members.  *Id.*

Concluding that the record at that time did not allow the Court of Appeals to determine

whether Defendants' predominance argument had merit, the case was remanded to the district

court to "offer the parties the opportunity to submit additional evidence and . . . then assess

whether Plaintiffs have 'affirmatively demonstrated [their] compliance' with Rule 23(b)(3)'s

predominance requirement."  *Id.* at 41 (quoting *Wal-Mart*, 564 U.S. at 350 (alteration in

original)).

**C.  Remand to District Court; Subsequent Proceedings; Experts**

Upon remand, this court scheduled an evidentiary hearing.  *See* Order, 14-cv-1142, ECF

No. 311.  The hearing was adjourned to allow the parties time to conduct discovery and obtain

expert analyses.  *See* Order, 14-cv-1142, ECF No. 325.  Discovery on the issues was allowed.

*See* Scheduling Order, 14-cv-1142 (July 8, 2019).

Plaintiffs submitted to the court three expert reports from Weir, one for each defendant.

*See* Suppl. Decl. Kimberly-Clark Colin B. Weir, 14-cv-1142, ECF No. 377 ("Weir Suppl. Decl.

Kimberly-Clark") (filed under seal as Suppl. Decl. Kimberly-Clark Colin B. Weir, 14-cv-1142,

ECF No. 337); Suppl. Decl. Costco Colin B. Weir, 14-cv-1142, ECF No. 378 ("Weir Suppl.

Decl. Costco") (filed under seal as Suppl. Decl. Costco Colin B. Weir, 14-cv-1142, ECF No.

339-1); Suppl. Decl. Procter & Gamble Colin B. Weir, 14-cv-4090, ECF No. 329 ("Weir Suppl.

Decl. Procter & Gamble") (filed under seal as Suppl. Decl. Procter & Gamble Colin B. Weir,

14-cv-4090, ECF No. 295-1).

Defendants submitted rebuttal reports. Suppl. Rebuttal Decl. Keith R. Ugone, Ph.D.,

14-cv-1142, ECF No. 376 ("Kimberly-Clark Ugone Suppl. Decl.") (filed under seal as Suppl.

Rebuttal Decl. Keith R. Ugone, Ph.D., 14-cv-1142, ECF No. 344); Suppl. Expert Report Denise

Martin, Ph.D., 14-cv-1142, ECF No. 380 ("Costco Martin Suppl. Decl.") (filed under seal as

Suppl. Expert Report Denise Martin, Ph.D., 14-cv-1142, ECF No. 342-1); Expert Report Carol

A. Scott, Ph.D., No. 14-cv-4090, ECF No. 328 ("Procter & Gamble Scott Suppl. Decl.") (filed

under seal as Expert Report Carol A. Scott, Ph.D., No. 14-cv-4090, ECF No. 301); Errata to

Expert Report Carol A. Scott, Ph.D., dated July 26, 2019, ECF No. 300-1.

A full evidentiary hearing was conducted beginning on August 6, 2019. *See* Evid. Hr'g

Tr. Each expert testified, as did a fact witness for Defendant Kimberly-Clark, Ken Champa.

Champa is senior brand manager for Kimberly-Clark's Cottonelle brand; he testified about

Kimberly-Clark third party data usage, pricing of Kimberly-Clark flushable wipes products,

competition for those products, consumer purchase motivations, and product and packaging

changes. *See id.* 238:16–330:20. The experts' reports and their testimony is described below.

### 1. Colin B. Weir

Weir is Vice President at Economics and Technology, Inc. ("ETI"), "a research and

consulting firm specializing in economics, statistics, regulation and public policy." Weir Suppl.

Decl. Kimberly-Clark 1; Weir Suppl. Decl. Costco 1; Weir Suppl. Decl. Procter & Gamble 1.

He holds an M.B.A., with honors, from the High Technology Program at Northeastern

University and a B.A. cum laude in business economics from The College of Wooster. *Id.* Prior

to joining ETI, he worked at Stop and Shop Supermarkets for seven years, as head of a cash

department, grocery/receiving clerk, and price-file maintenance head.  *Id.*  Since joining ETI, he

has consulted on a number of consumer and wholesale products matters.  *Id.*  Weir has provided

expert testimony before federal and state courts, the Federal Communications Commission, and

state regulatory commissions.  *Id.*

During the pre-remand class certification proceedings, Weir submitted expert reports

proposing three damages models: (1) full compensatory damages, (2) statutory price premium

damages, and (3) statutory damages.  *Kurtz*, 321 F.R.D. at 523.  In those reports, Weir

"propose[d] using hedonic regression analysis, a tool that purports to measure the value of

various product attributes in order to demonstrate the existence of, and to isolate the amount of, a

price premium attributable to [D]efendants' use of 'flushable' in merchandising."  *Id.*  At that

time, Weir proposed relying on evidence from Defendants, industry resources, and independent

market research data; he provided a preliminary list of product attributes on which he would rely

to run his analysis.  *Id.*

Weir carried out his proposed hedonic regression analysis after remand.  As detailed in

his reports and during the evidentiary hearing, this entailed several steps.

*First*, Weir collected two types of data: sales data and product attribute data.  Sales data

was gathered from several sources.  Weir obtained from IRI weekly sales of flushable wipes,

other wipes, and toilet tissue from February 2010 through May 2019 in New York State.  Weir

Suppl. Decl. Kimberly-Clark ¶ 46; Weir Suppl. Decl. Costco ¶ 47; Weir Suppl. Decl. Procter &

Gamble ¶ 44.  IRI is a market research company that collects sales data from retailers and makes

that data available to companies and market researchers.  *See* Evid. Hr'g Tr. 15:13–21; *see also*

About Us, *IRI*, https://www.iriworldwide.com/en-US/Company/About-Us (last visited Oct. 24,

2019) ("IRI integrates the world's largest set of otherwise disconnected purchase, media, social,

causal and loyalty data to help [consumer packaged goods], retail, over-the-counter health care and media companies grow their businesses."). Another company, Nielsen, operates in the market research business and competes with IRI. *See* Evid. Hr'g Tr. 17:17–25. Third party market research of this kind is generally relied on by Defendants. *Id.* 16:10–23; Weir Suppl. Decl. Kimberly-Clark ¶ 47; Weir Suppl. Decl. Costco ¶ 48; Weir Suppl. Decl. Procter & Gamble ¶ 45. In Weir's extensive experience "major businesses in the United States either use Nielsen or IRI data on a routine basis." Evid. Hr'g Tr. 18:1–12.

Weir obtained data from IRI for nationwide products after conducting product research, including a review of top selling brands of wipes and of product labels with label claims useful for a comparison. *Id.* 31:4–32:17, 33:18–34:12. He chose the same products as he did for the hedonic regression analysis he had performed in a flushable wipes consumer action brought against Defendant Procter & Gamble in the United States District Court for the Northern District of California, *Pettit v. Procter & Gamble Company*, No. 15-cv-2150, since the products used in that analysis were sold nationwide. Evid. Hr'g Tr. 31:4–32:17. He received statistical results that satisfied him as an expert that the data was appropriate for use in New York. *Id.* Weir noted that his statistical analysis does not require the inclusion of data for every product to arrive at "a statistically reliable result[.]" *Id.* 20:16–21. Most IRI sales data is at the level of actual, individual transactions obtained from retailers, while about 15% of the sales is estimated by IRI. *Id.* 18:13–25. The identity of private label products is generally masked. *Id.* 19:1–15. Weir properly confirmed the accuracy of the IRI data prior to using it:

> Q What did you do to confirm that the IRI data was accurate?
>
> A I looked at a number of indicia of the IRI data including its use by companies generally and defendants in this case. I looked at information provided by IRI to understand their data collection methods. There are other data sources, I think this is now going back five years so I apologize that my memory may not be perfect, but

there were other sources of data against which I was able to compare the IRI data to determine that they were in agreement across multiple sources.

Q So what sources of data did you compare [with] the IRI data you used?

A There were, and I haven't looked at them recently, but there were other sales data that were provided to me back in 2015 against which I was able to compare the then current IRI data.

*Id.* 147:25–148:15.

Also obtained by Weir was sales data from online retailers Amazon.com and Drugstore.com and internal transaction-level data and coupon discount data from Defendant Costco. Weir Suppl. Decl. Kimberly-Clark ¶ 48; Weir Suppl. Decl. Costco ¶¶ 49, 51; Weir Suppl. Decl. Procter & Gamble ¶ 46. Weir explained in his reports that he obtained Nielsen market research data from Kimberly-Clark and Procter & Gamble; this material was not challenged at the hearing. Kimberly-Clark Weir Suppl. Decl. ¶ 49; Weir Suppl. Decl. Procter & Gamble ¶ 47.

The second type of data Weir obtained was product attribute data—information about what characteristics products claim, *e.g.*, flushability and number of sheets per package. Weir obtained and reviewed product labels in gathering this data. Evid. Hr'g Tr. 15:22–16:4. He did not obtain all historic label data, because, in his experience as an expert, that is not necessary when the attribute of interest is constant; he determined the flushable label is constant here. *Id.* 28:2–23, 38:5–12. He also obtained product attribute data from IRI. *Id.* 15:22–16:4.

*Second*, Weir prepared the data for use in a hedonic regression analysis. For Defendants Kimberly-Clark and Procter & Gamble, he used information from IRI for the necessary sales data. *Id.* 22:7–15. Although other data was available and it is "technically possible that it could be incorporated into the analysis," he claimed, the litigation schedule did not afford him the time

to include the additional data. *Id.* 22:13–15. For Defendant Costco, Weir used IRI and Costco

sales data. Weir Suppl. Decl. Costco ¶ 57. These decisions by him had the effect of excluding

all private label products for Defendants Kimberly-Clark and Procter & Gamble and private label

products other than Costco's for Defendant Costco. Weir testified that this does not affect the

robustness of the methodology, "[b]oth because of [his] past experience showing that inclusion

of such products does not have a material result when they are included, but also because if you

look at peer-reviewed literature you will see many people studying products but that don't

include private label brands." Evid. Hr'g Tr. 762:1–6.

　　　For each defendant, Weir integrated the sales data with product attribute information.

Weir Suppl. Decl. Kimberly-Clark ¶ 55; Weir Suppl. Decl. Costco ¶ 57; Weir Suppl. Decl.

Procter & Gamble ¶ 53. He identified "top-selling products representing a majority of the sales

identified by IRI," obtained labels for those products, and generated a spreadsheet of

manufacturer claims on the product labels and other product claimed attributes. *Id.* Weir had

engaged in essentially the same analysis in *Pettit v. Procter & Gamble Company*. *Id.* He

utilized in the instant litigation the data set of product attributes he prepared in that Northern

District of California case. *Id.* For Defendant Costco, product label and attribute information

from products sold at Costco were added to this data set. Weir Suppl. Decl. Costco ¶ 57.

　　　He identified the following product attributes as variables to be used in the hedonic

regression analysis: (1) "flushable" claims, (2) brand, (3) number of sheets, (4) number of packs,

(5) wipe area, (6) package type, (7) baby & toddler/adult, (8) travel pack, (9) alcohol free,

(10) hypoallergenic, (11) aloe & vitamin E, (12) fragrance/scent, (13) natural claims, and

(14) sensitive/gentle claims. Weir Suppl. Decl. Kimberly-Clark ¶ 56; Weir Suppl. Decl. Costco

¶ 58; Weir Suppl. Decl. Procter & Gamble ¶ 54.

For Defendant Costco, whether the products were sold at Costco was also a variable.

Weir Suppl. Decl. Costco ¶ 58.

Weir explained in his reports and during the evidentiary hearing the variables and how he decided upon them:

> I had gone through a process of examining the underlying sales data, understanding which products were large sellers in the marketplace, reviewing the labels, reviewing the deposition testimony of corporate executives that work with these products to get an understanding of the likely product attributes for inclusion in the model and then running a number of regressions to test the specification of the model to find the specification that, in tandem with economic theory, the facts of the case and the statistics . . . for evaluating regression, appeared to produce a reliable result.

Evid. Hr'g Tr. 23:21–24:6.  He explained that he took adequate steps to ensure he had all appropriate variables:

> . . . [T]hat's done through a combination of analysis of the facts at hand, looking at the nature of the products, looking at the statistics of the regression. There's no rule that says these are the attributes that you need to look at. It's basically something where you need to apply some amount of judgment based on the facts and circumstances of your research objective and the nature of what it is that you're studying.

*Id.* 25:19–26:1; *see also* Weir Suppl. Decl. Kimberly-Clark ¶¶ 57–70; Weir Suppl. Decl. Costco ¶¶ 59–73; Weir Suppl. Decl. Procter & Gamble ¶¶ 55–68.

After completing steps one and two, *third*, Weir performed the hedonic regression analysis with "Stata," a commercially available program that is widely used by economists; he found a price premium attributable to the flushable claim.  Weir Suppl. Decl. Kimberly-Clark ¶¶ 71–72; Weir Suppl. Decl. Costco ¶¶ 74–75; Weir Suppl. Decl. Procter & Gamble ¶¶ 69–70. In reliance on econometric literature, he converted the sales data into quarterly data and analyzed product attributes and control variables as potential explanations of price.  Weir Suppl. Decl. Kimberly-Clark ¶¶ 76–77; Weir Suppl. Decl. Costco ¶¶ 79–80; Weir Suppl. Decl. Procter &

SPA-153

Gamble ¶¶ 74–75.  After testing several different specifications, he concluded that the model is reliable in demonstrating whether there is a price premium associated with the flushable claim. Weir Suppl. Decl. Kimberly-Clark ¶ 78; Weir Suppl. Decl. Costco ¶ 81; Weir Suppl. Decl. Procter & Gamble ¶ 76.

Weir's results indicate that there is a marketwide percentage price premium for a wipe with a flushable claim:  The hedonic regression model developed for the Kimberly-Clark class demonstrates that consumers paid 6.215% more for a wipe advertised as flushable than they would have for a wipe not labeled as flushable; the hedonic regression model developed for the Costco class demonstrates that consumers paid 8.5619% more for a wipe advertised as flushable; and the hedonic regression model developed for the Procter & Gamble class demonstrates that consumers paid 7.95% more for a wipe advertised as flushable.  Weir Suppl. Decl. Kimberly-Clark ¶ 79; Weir Suppl. Decl. Costco ¶ 82; Weir Suppl. Decl. Procter & Gamble ¶ 77.

Various metrics confirm the reliability of the results, according to Weir.  The R-squared and the adjusted R-squared are widely used indicators of the explanatory power of a regression model; they demonstrate the percent variation in a dependent variable that can be explained by independent variables.  Weir Suppl. Decl. Kimberly-Clark ¶ 42; Weir Suppl. Decl. Costco ¶ 43; Weir Suppl. Decl. Procter & Gamble ¶ 40.  For each defendant, relatively high adjusted R-squared values indicate that the hedonic regression model explains the variation in the dependent variable to a high degree.  Weir Suppl. Decl. Kimberly-Clark ¶ 81 ("the model is explaining 92.7% of the variation of the dependent variable"); Weir Suppl. Decl. Costco ¶ 84 ("the model is explaining 94.9% of the variation of the dependent variable"); Weir Suppl. Decl. Procter & Gamble ¶ 79 ("the model is explaining 92.8% of the variation of the dependent variable").

Weir also explained that the F-statistic, an indicator of explanatory power which helps determine whether the model makes statistical sense, confirms that the model has "strong explanatory power."  Weir Suppl. Decl. Kimberly-Clark ¶¶ 43, 81; Weir Suppl. Decl. Costco ¶¶ 44, 84; Weir Suppl. Decl. Procter & Gamble ¶¶ 41, 79.

A third metric, the T-statistic is used to evaluate whether a result is statistically significant.  Weir Suppl. Decl. Kimberly-Clark ¶ 44; Weir Suppl. Decl. Costco ¶ 45; Weir Suppl. Decl. Procter & Gamble ¶ 42.  It indicates that the result for each defendant is statistically significant at the 99% confidence level.  Weir Suppl. Decl. Kimberly-Clark ¶ 82; Weir Suppl. Decl. Costco ¶ 85; Weir Suppl. Decl. Procter & Gamble ¶ 80.

In sum, Weir concluded that there is a strong likelihood that each member of the three classes paid a percentage amount more for a wipe with a flushable claim than they would have if the wipe did not have a flushable claim.  Evid. Hr'g Tr. 759:8–10 ("[I]f we observe a marketwide price premium, then all consumers universally are impacted by that marketwide price premium.").  Weir explained that the marketwide premium is unaffected by discounts, promotions, or special offers, because "[b]y lowering the product's overall price, you will lower the cash amount that people have paid in premium but not the change in value for that product." *Id.* 759:21–23.

The apparent mismatch between the time periods of the certified classes and the models was addressed by Weir.  To the extent that the model does not include data from 2008 and 2009, years which are part of the Kimberly-Clark class period, Weir stated that "it would be . . . reasonable . . . to apply the premium for the longer period for which we have data to" 2008 and 2009, "based on what [he has] seen from [his] regression results."  *Id.* 141:20–24, 143:21–23.  Weir also testified that using his model on various date ranges ending in 2017, when the class

13

periods currently end, also results in a calculable price premium.  *See id.* 765:10–767:21,

773:20–775:18, 776:18–24.

 Overall, Weir presented his analysis clearly and precisely during the hearings on remand.

This court found him qualified, reasoned, deliberate, and credible.  His regression calculations

took into account the relevant objections of Defendants' experts, and he responded at length, and

convincingly, to the criticisms of Defendants' experts, *see infra*, Sections II.C.2, II.C.3, II.C.4.

*See generally* Evid. Hr'g Tr. 10:18–227:7, 233:6–235:11, 758:12–789:5.  He explained the

reasoning for various judgments he, as an expert, made and described how changing the model to

account for "mistakes" or "problems" raised by Defendants did not change the accuracy of his

model.  *See id.* 758:12–768:3, 773:12–779:5.

 Defendants moved to exclude Weir's report and testimony.  *See* Kimberly-Clark Corp.'s

Post-Hr'g Br. Supp. Oral Mot. Exclude Test. Colin Weir & Opp'n Class Cert. 14–40,

No. 14-cv-1142, ECF No. 362; Def. Costco Wholesale Corp.'s Post-Hr'g Br. Supp. Decert. Class

25–31, No. 14-cv-1142, ECF No. 379 (filed under seal as Def. Costco Wholesale Corp.'s Post-

Hr'g Br. Supp. Decert. Class, No. 14-cv-1142, ECF No. 358-1); Def. Procter & Gamble Co.'s

Mem. L. Supp. Decert. Damages Class Pursuant Mandate Ct. Appeals 2d Cir. 2 n.2, No. 14-cv-

4090, ECF No. 322.  Those motions are discussed *infra*, in Section III.A, and are denied.

  **2.  Dr. Keith R. Ugone**

 Kimberly-Clark's expert rebutting Weir is Dr. Keith R. Ugone, a Managing Principle at

Analysis Group.  Kimberly-Clark Ugone Suppl. Decl. ¶ 13.  Dr. Ugone has a B.A. from the

University of Notre Dame, an M.A. from the University of Southern California, and a Ph.D.

from Arizona State University—all in economics.  *Id.* ¶ 16.  In his current position, he provides

economic, financial, and damages-related consulting services to clients, and has done so in many

litigations, including consumer actions.  *Id.* ¶ 14.  Although Dr. Ugone has performed economic

analyses of various types, he has never developed and performed a hedonic regression analysis from start to finish.  Evid. Hr'g Tr. 403:16–404:7.  He noted during the hearing that "it's very much an art in terms of putting [a hedonic regression analysis] together."  *Id.* 406:4–5.

During prior class certification proceedings, Dr. Ugone raised a number of criticisms about Weir's proposed hedonic regression analysis, *see Kurtz*, 321 F.R.D. at 525, which he largely repeated in his post-mandate report and during the post-mandate hearing.  Dr. Ugone's criticisms fall into three categories.

*First*, hedonic regression analysis is inappropriate in this case since evaluating the alleged economic injury requires individualized inquiry because consumers (1) vary in their reasons for purchasing flushable wipes, (2) have different knowledge, perception, and behavior as to the flushable claim, (3) have different post-purchase experiences, and (4) paid different prices for wipes.  Kimberly-Clark Ugone Suppl. Decl. ¶¶ 26–61.

*Second*, Weir's analysis is flawed because (1) the challenged products' consistency in price over time suggests the lack of a causal link between the alleged misrepresentations and any price premium; and (2) inappropriate product categories are compared, attributes affecting price are ignored, and Weir's dataset is incorrectly and inappropriately composed.  *Id.* ¶¶ 62–96.  Dr. Ugone attempted to support his objection by having his staff run Weir's model for alternate time periods and to control for other attributes, resulting in significant variation in result as to the price premium, including results showing price premiums that are allegedly not statistically significant.  *Id.* ¶¶ 76–96; Evid. Hr'g Tr. 420:5–18.

And, *third*, Weir's methodology would not result in a reliable measure of damages if a "full refund" was used to calculate damages.  Kimberly-Clark Ugone Suppl. Decl. ¶¶ 97–102.

15

In coming to these conclusions, Dr. Ugone reviewed depositions, documentary evidence, Weir's reports, and the data underlying Weir's reports. Evid. Hr'g Tr. 335:22–336:7; Kimberly-Clark Ugone Suppl. Decl. ¶ 18.

Dr. Ugone was qualified and systematic in his approach to his rebuttal exercise.

Plaintiff Kurtz moved to exclude Dr. Ugone's testimony. Pl.'s Omnibus Mem. L. Further Supp. Pl. Kurtz's Mot. Class Cert. & Opp'n Defs' Mots Deny Class Cert., & Supp. Pl.'s Mot. Strike Opinions Kimberly-Clark's Expert Witness 47–56, No. 14-cv-1142, ECF No. 360. That motion is discussed *infra*, in Section III.B, and it is denied.

### 3. Dr. Denise Martin

Costco's rebuttal expert is Dr. Denise Martin, a Managing Director at NERA Economic Consulting. Costco Martin Suppl. Decl. ¶ 4. She has been retained as an economic expert in more than 200 class actions. *Id.* ¶ 5. During her undergraduate economics studies at Wellesley College and her graduate economics studies at Harvard University, from which she obtained a Ph.D., Dr. Martin was trained in economic methods, including hedonic regression analysis. *Id.* ¶ 4. But, like Dr. Ugone, Dr. Martin has never developed and performed a hedonic regression analysis from start to finish. Evid. Hr'g Tr. 715:23–716:7.

Dr. Martin submitted expert reports criticizing Weir's proposed methodology during the prior class certification proceedings, *see Kurtz*, 321 F.R.D. at 524–25. Post-remand, she criticizes Weir on five principle grounds. *First*, assuming that using only Costco data for the hedonic regression analysis would be appropriate, doing so would be impossible because all of Costco's wipes with a flushable claim are for adults, resulting in collinearity and an inability to separate any effect of the flushable claim on price from an effect of the adult claim on price. Costco Martin Suppl. Decl. ¶¶ 7–18. *Second*, by relying on data for non-Costco products, Weir provides a premium that is not specific to Costco and, "at best" estimates an average relationship

across all retailers and brands.  *Id.* ¶¶ 19–21.  *Third*, Weir ignores evidence that (1) prices at

Costco are deliberately low and set by adding to costs a fixed amount, and (2) the price premium

for flushable wipes at Costco, as compared to non-flushable Costco brand wipes, could be

because of volume discounting.  *Id.* ¶¶ 22–24.  *Fourth*, because the market for wipes is not

perfectly competitive, the coefficient measuring the relationship between the flushable claim and

price Weir calculates is not equivalent to a price premium.  *Id.* ¶ 25a.  Dr. Martin noted,

however, that this criticism does not mean that "you can't run a hedonic regression analysis in a

market that's not perfectly competitive[,]" clarifying that she disagreed with Weir "interpret[ing]

the coefficient on the flushable attribute . . . as the difference in price."  Evid. Hr'g Tr. 651:19–

652:3.  *Fifth*, even assuming that hedonic regression could calculate a price premium, Weir's

definition of flushable is overbroad and wipes offer other benefits, which Weir omitted as

variables.  Costco Martin Suppl. Decl. ¶ 25b.  Dr. Martin also concludes that Weir incorrectly

defined the market of products and inappropriately chose product data for his analysis.  *Id.* at 3

n.10; *id.* at 8 n.20.

The court found Dr. Martin qualified, forthcoming, and deliberate in her approach to

rebutting Weir.

### 4.  Dr. Carol A. Scott

Procter & Gamble's rebuttal expert, Dr. Carol A. Scott, was part of prior proceedings.

*See Kurtz*, 321 F.R.D. at 524.  Dr. Scott obtained her B.S. in business and history education from

the University of Texas at Austin, and has an M.S. in management and a Ph.D. in marketing

from Northwestern University.  Procter & Gamble Scott Suppl. Decl. Ex. A, at 2.  She is a

Professor Emeritus of marketing at the Anderson Graduate School of Management, University of

California, Los Angeles.  Procter & Gamble Scott Suppl. Decl. ¶ 2.  She has taught a number of

marketing courses and her marketing research has been published widely.  *Id.* ¶ 3.  Dr. Scott has

provided expert analysis and testimony in litigation.  *Id.* ¶ 2.

Dr. Scott criticizes Weir's approach and methodology as follows:  *First*, the data

underlying Weir's analysis is insufficient because (1) price was not available for private label

products, (2) Weir used inaccurate product characteristics and package claims, particularly when

package claims changed, (3) he included in the market products that are not direct competitors to

flushable wipes, and (4) his decision as to what products to include was arbitrary.  *Id.* ¶¶ 15–36.

*Second*, the hedonic regression Weir performed cannot calculate the price premium for the

flushable claim because Weir made no effort to account for any correlation between "superior

cleaning capability" and flushability, and Weir's definition of flushable fails to account for the

potential value of individual benefits.  *Id.* ¶¶ 37–50.  *Third*, Weir made statistical mistakes in his

analysis; he used a time period longer than the proposed class period and incorrectly coded

brands of wipes, correction of which resulted in there being no statistically significant price

premium.  *Id.* ¶¶ 52–63.  Dr. Scott explained that Weir's analysis also runs counter to real world

evidence demonstrating that Procter & Gamble did not decrease the price of its Always feminine

hygiene wipe when the flushable label was removed.  Evid. Hr'g Tr. 509:5–513:2.

Dr. Scott was credible and deliberate, but not convincing, in her attack on Weir's results.

### III. Admissibility of Expert Testimony

Expert testimony is admissible when the witness is "qualified as an expert by knowledge,

skill, experience, training or education" and the proposed "testimony is based upon sufficient

facts or data" and "is the product of reliable principles and methods" "reliably applied to the

facts of the case."  Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms*, 509 U.S. 579 (1993).

District courts act as gatekeepers with respect to expert evidence and have "broad discretion" to

determine whether such evidence should be admitted or excluded.  *Amorgianos v. Nat'l R.R.*

*Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  Important to this inquiry is that a district

court "focus on the principles and methodology employed by the expert, without regard to the

conclusions the expert has reached or the district court's belief as to the correctness of those

conclusions." *Id.* at 266.

      The testimony of Dr. Martin and Dr. Scott is admissible.  At issue are motions to exclude

the testimony of Weir and Dr. Ugone.  As indicated on the record, both motions are rejected.  *See*

Tr. 6:11–17, Oct. 8, 2019.  Though the experts disagree, they were highly qualified in fields

relevant to inquiries made here.  That the court found Weir more reliable than Dr. Ugone is not a

basis for striking the latter's opinion.

### A.  Colin B. Weir

      Weir is qualified by education and experience to conduct hedonic regression analyses.

*See supra*, Section II.C.1.  He worked for several years in the consumer retail field and has

conducted many hedonic regression analyses.  Other courts have concluded that he is qualified to

render such opinions.  *See, e.g.*, *Hadley v. Kellogg Sales Co.*, No. 16-CV-04955-LHK, 2019 WL

3804661, at *24 (N.D. Cal. Aug. 13, 2019); *Pettit v. Procter & Gamble Co.*,

No. 15-CV-02150-RS, 2017 WL 3310692, at *4 (N.D. Cal. Aug. 3, 2017); *Scotts EZ Seed*, 304

F.R.D. at 413–14.

      Weir's analysis is based upon sufficient data.  Reliable methods were properly applied to

that data.  Hedonic regression analyses are widely accepted as sound statistical models of proof

in consumer actions of this nature.  *See, e.g.*, *Hadley*, 2019 WL 3804661, at *24; *Schmitt v.

Younique LLC*, No. SACV171397JVSJDEX, 2019 WL 1431906, at *9–10 (C.D. Cal. Jan. 10,

2019); *Pettit*, 2017 WL 3310692, at *4; *Langan v. Johnson & Johnson Consumer Companies,

Inc.*, No. 3:13-CV-1470 (JAM), 2017 WL 985640, at *5–8 (D. Conn. Mar. 13, 2017), *vacated

and remanded on other grounds*, 897 F.3d 88 (2d Cir. 2018); *Kumar v. Salov N. Am. Corp.*,

No. 14-CV-2411-YGR, 2016 WL 3844334, at *10 n.10 (N.D. Cal. July 15, 2016); *Scotts EZ Seed*, 304 F.R.D. at 413–14.

Lack of perfect competition in the flushable toilet wipes market, assuming that is the case, does not mean that hedonic regression analysis is inadmissible as evidence of a price premium. The competitive status of the market can be properly considered in assigning weight to the statistical evidence. Defendants' resort to cases discussing fraud-on-the-market and claims arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, offer no support for rejecting a commonly accepted statistical method of proof.

*In re NJOY, Inc. Consumer Class Action Litigation*, a case from the United States District Court for the Central District of California which is not binding on this court, similarly offers no support for exclusion. *See In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-428-JFW (JEMX), 2016 WL 787415 (C.D. Cal. Feb. 2, 2016). There, the court declined to exclude a hedonic regression analysis but later concluded that lack of perfect competition in the market, in addition to other issues specific to the particular model, made the model an insufficient basis for class certification. *Id.* at *9.

Regressions should not be excluded on the ground that they fail to meet arbitrary thresholds of statistical significance. In the current case, there are high degrees of statistical significance and any dispute about economic conclusions goes to weight not admissibility. *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362–63 (7th Cir. 2001) ("The question whether a study is responsible and therefore admissible under the *Daubert* standard is different from the weight to be accorded to the significance of a particular correlation found by the study. It is for the judge to say, on the basis of the evidence of a trained statistician, whether a particular significance level, in the context of a particular study in a particular case, is too low to make the

study worth the consideration of judge or jury."); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *15 (N.D. Cal. Apr. 4, 2014) ("The Court finds that the fact that these two variables are not statistically significant at the 1%, 5%, and 10% levels goes to the weight, not the admissibility of [the] model.").

Nor does Weir's use of IRI data render his testimony inadmissible as based on unreliable data.  In *In re Amla Litigation*, the court decertified a class of consumers on the basis that use of IRI projections was unreliable without additional inquiry into the methodology by which those projections were made.  *See In re Amla Litig.*, 16-cv-6693, ECF No. 332 (S.D.N.Y. Aug. 7, 2019).  Here, Weir obtained transaction-level data directly from IRI and reviewed the company's methods of data collection to test reliability.

Weir carefully developed and executed his hedonic regression model and actually produced it.  He identified his research objective, studied the products and the market, carefully collected and analyzed data, used a widely-accepted analytical model, and tested his results. During the evidentiary hearing, he described this process at length, including how and why he made judgments as to what product data to collect and use, attribute selection and definition, and extrapolation of results to time periods and products not included in the data.

Any objections to Weir's specific hedonic regression analyses go to weight rather than admissibility.  The development of a hedonic regression is, as Dr. Ugone said, "an art."  None of Defendants' experts developed a hedonic regression from scratch as Weir did; their second-guessing of his choices in attempting to demonstrate that the methodology is unreliable is unpersuasive.  To the extent that Defendants contend that individual issues undermine the reliability of Weir's analysis, such as the inability to define "flushable," these arguments have already been considered and rejected by this court.  *See generally Kurtz*, 321 F.R.D. 482.

21

Plaintiffs have demonstrated that Weir's opinions are based on sufficient, reliable facts and data and that their expert applied an accepted, deliberately designed methodology reliably to form his opinions.  Weir's opinions are admissible.

**B.  Dr. Keith Ugone**

The court rejects Plaintiff Kurtz's motion to exclude Dr. Ugone's testimony.  As already described, he is qualified by education and experience to offer his opinions.  *See supra*, Section II.C.2.  He offered a well-reasoned explanation of why he opined that hedonic regression analysis, and common economic proofs more generally, are insufficient in this case as a matter of economics, not as a matter of law.  Though the fact that he has not developed and performed a hedonic regression analysis is important in assigning weight to his testimony, it does not require exclusion of his opinions.  *See In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("It is worth noting in this respect that defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts.  Contradiction is to be expected and is often unresolvable without trial.").  Nor does his work with a team of individuals require exclusion, when he reviewed depositions, documents, Weir's report, and the data underlying Weir's report. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002) ("An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify.").

Dr. Ugone's opinions are admissible.

**IV. Predominance**

To certify a damages class under Federal Rule of Civil Procedure 23(b)(3), "a plaintiff . . . must establish [, *inter alia*,] predominance—that questions of law or fact common to class members predominate over any questions affecting only individual class members."  *Johnson v.*

22

*Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).  "The . . . predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  At issue is whether questions common to the class "can be answered . . . as a whole through generalized proof and that those common issues are more substantial than individual ones."  *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010) (citation omitted).  Predominance "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof."  *Sykes v. Mel S. Harris and Assocs LLC*, 780 F.3d 70, 81 (2d Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 469 (2013) (emphasis in original)).  And plaintiffs need not be prepared at the certification stage "to demonstrate through common evidence the precise amount of damages incurred by each class member."  *Sykes*, 780 F.3d at 82 (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013)).

The Court of Appeals for the Second Circuit has asked this court to review the record and conclude whether Plaintiffs have demonstrated that they can prove "injury and causation . . . at trial with common evidence" so that they "have affirmatively demonstrated [their] compliance with Rule 23(b)(3)'s predominance requirement."  *Kurtz*, 768 F. App'x at 41 (internal quotation marks and citation omitted).  Before appeal, this court concluded that Plaintiffs had met this burden.  The same conclusion is reached on remand.

Plaintiffs introduced evidence—the analysis and testimony of Weir—supporting the contention that there is a marketwide price premium attributable to the flushable label on toilet wipes, and that every New York consumer paid a percentage amount more for flushable toilet wipes as a result of this characterization.  *See supra*, Sections II.C.1, III.A.  The evidence sufficiently demonstrates that common evidence can prove causation and injury.  Other courts

23

have certified classes of consumers with similar evidence. *See, e.g.*, *Hadley*, 2019 WL 3804661, at \*24; *Schmitt*, 2019 WL 1431906, at \*9–10; *Pettit*, 2017 WL 3310692, at \*4; *Kumar*, 2016 WL 3844334, at \*10; *Scotts EZ Seed*, 304 F.R.D. at 413–14; *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 571–72 (S.D.N.Y. 2014).

Defendants argue that Weir's hedonic regression analysis fails to comply with rules articulated in *Comcast Corporation v. Behrend*, in which the Supreme Court reversed certification of a Rule 23(b)(3) class because the regression model in question accounted for four theories of antitrust injury, rather than the one antitrust injury still at issue in the class litigation. 569 U.S. 27, 31–36 (2013). Defendants contend that everything from Weir's product attribute choices to his data selection fail *Comcast*. This is a misreading of that case. "*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury . . . ." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (citing *Comcast*, 569 U.S. at 34–35).

Weir's model and testimony match Plaintiffs' *single* theory of the case that consumers paid more for flushable toilet wipes because of the flushable label on Defendants' products. Disagreement about Weir's judgments in developing and performing the model, as well as disagreement about whether Weir's judgment about extrapolation of the results of his model to certain time periods or products, are questions answerable by admitted evidence. Weir made reasoned decisions about how to actually construct and run a model testing Plaintiffs' theory of liability. The model fits the theory of Plaintiffs' case. *See Scotts EZ Seed*, 304 F.R.D. at 414 ("In sum, plaintiffs' full compensatory damages and price premium damages models satisfy *Comcast* because they match plaintiffs' theories of liability.").

Defendants raise a number of arguments opposing predominance.  They claim that predominance is defeated by the plethora of individualized issues.  Individual issues do not predominate for the reasons already explained.  *See Kurtz*, 321 F.R.D. at 547–52.  Plaintiffs allege that they were injured at the time of purchase of Defendants' products when they paid a marketwide inflated price because of the flushable label.  Individual understanding of the term "flushable," experiences of flushability after purchase, or even motivations for purchase do not affect the price paid at the cash register.  *See Ebin*, 297 F.R.D. at 568–69 (explaining that whether or not a class member wanted to purchase a product with a misleading label, "they nevertheless paid too much for it").  Of no consequence are arguments that Plaintiffs have not demonstrated that any single consumer was injured.  Plaintiffs have submitted proof that every consumer paid a percentage amount more for wipes labeled flushable, regardless of what price was actually paid or the subsequent use of the wipes, because of a marketwide price premium caused by the flushable label.

No field work demonstrates, at this point in the litigation, what percentage of consumers who buy Defendants' wipes use them for something other than toileting purposes or use the wipes for toileting purposes but do not flush them.  Such evidence might be useful, but the lack of it, at this stage of the litigation before discovery is completed, does not weigh against concluding that Plaintiffs have met their burden on predominance for certification purposes.

A related criticism is that Weir generated an average relationship between price and the flushable label across the market, unrelated to any particular defendant's product or conduct.  This ignores Plaintiffs' contention that there is a *marketwide inflation of price by a particular calculable percentage*.  For *every* flushable wipe product purchased, the consumer paid more

25

because of the flushable misrepresentation.  There is no need for individualized inquiry as to causation or injury.

To the extent that Defendants have raised concerns about Weir's model and its ability to calculate damages, notably their arguments that there are individualized issues of when or where a consumer made her purchase, these arguments are rejected.  "Plaintiffs need not prove exactly what their damages will be."  *Kurtz*, 321 F.R.D. at 450; *see also Roach*, 778 F.3d at 407 ("*Comcast* . . . did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance.").

In the instant case, if liability is found, precise statutory damages may be requested on a classwide basis.  N.Y. Gen. Bus. Law § 349(h) (providing for statutory damages of $50 to each class member for each time defendant violated the statute by a sale).  "The single question of whether plaintiffs paid more than they would have for the good because of the deceptive practices of the defendants-sellers in labeling their products as 'flushable' predominates over any individualized damages inquiries."  *Kurtz*, 321 F.R.D. at 550–51.

Finally, Defendants contend that market evidence, such as Defendants' pricing policies and the stability of flushable toilet wipe prices over the time in which alleged misrepresentations have been covered by the media, contradict Plaintiffs' evidence of a marketwide price premium.  This argument does not negate the force of the regression as the court considers predominance.

Plaintiffs have met their burden and produced common proof of causation and injury.  Individualized issues do not predominate.  In Weir's expert declarations supporting class certification submitted pre-remand, he raised two other alternative methods for determining a price premium:

> It would also be possible to evaluate the difference in price attributable to the "flushable" label ... using statistical survey techniques such as contingent valuation (a representative survey technique that asks people to directly report their willingness to pay to obtain a specific good or product attribute, or willingness to accept to give up a good or product attribute) or conjoint analysis (a representative survey technique where survey panelists are confronted with various choices of product attributes, prices, and other alternatives, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof) the results of which permits an economist to analyze the value of various product attributes.

*Kurtz*, 321 F.R.D. at 524. Neither type of analysis has been covered during the remand period. They are not needed since the regression used was sufficient to show unity of class. The district court's current certification orders are maintained.

### V. Conclusion

Plaintiffs' claims—also raised by consumers in other states and by municipalities—would best be resolved on a national basis. Coordinated resolution by the appropriate federal administrative authorities may need to be considered. *See Kurtz*, 321 F.R.D. at 495–96; *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 79 (E.D.N.Y. 2015) ("Whether wipes should be labeled 'flushable' is a national issue that requires a single national resolution."). In the absence of such appropriate action, a global settlement through which manufacturers and retailers such as Defendants are subject to a single set of rules governing flushability and packaging might be preferable and a basis for a simple national settlement.

After remand, Defendant Procter & Gamble advised this court of its resolution of consumer litigation concerning claims similar to Plaintiffs' covering wipes labeled as flushable purchased in all United States jurisdictions outside of New York State. *See* Letter from C. Lannin, No. 14-cv-4090, ECF No. 277; Order Granting Final Approval Class Action Settlement

& J., No. 15-cv-2150 (N.D. Cal. Mar. 28, 2019), ECF No. 135.  New York consumers were not included in the settlement.

The economic strength of the United States can be attributed, in part, to its single common market with uniform products sold throughout the country.  *Cf. Granholm v. Heald*, 544 U.S. 460, 472 (2005) ("States may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses.  This mandate 'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979)); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 803 (1976) ("[T]his Nation is a common market in which state lines cannot be made barriers to the free flow of both raw materials and finished goods in response to the economic laws of supply and demand.").

The desirability of a single common market with uniform products is enhanced by the New York State damages provision applicable in this class action.  Plaintiffs seek $50 for each purchase during the class period, pursuant to New York General Business Law Section 349, which permits a plaintiff "to recover his actual damages *or fifty dollars, whichever is greater*." N.Y. Gen. Bus. Law § 349(h) (emphasis added); *see Kurtz*, 321 F.R.D. at 500–02.

A recovery of this nature in a class action—potentially a total of many tens of millions of dollars— is permitted in federal court by Supreme Court precedent, but would arguably be prohibited were the class action brought in a New York State court.  *Compare* N.Y. CPLR § 901(b) ("Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or

minimum measure of recovery created or imposed by statute may not be maintained as a class action."), *with Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–416 (2010) (concluding that N.Y. CPLR Section 901(b) did not preclude federal class actions seeking statutory damages under New York State law); *see also Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1014–16 (N.Y. 2007) (evaluating the application of CPLR Section 901(b) and whether treble antitrust damages are a "penalty" not recoverable in a class action, while explaining that "the determination of whether a certain provision constitutes a penalty may vary depending on the context.").

Complex *Erie* problems raising and intermingling substantive and procedural issues will need thorough consideration as this class action proceeds. *Compare Shady Grove*, 559 U.S. at 398–416, *with id.* at 436–59 (Ginsburg, J., dissenting); *see also Kurtz*, 321 F.R.D. at 501–02 (citing New York academics and caselaw in support of the contention that the dissenting opinion in *Shady Grove* would be operative in the present case); *Belfiore*, 311 F.R.D. at 54–59 (discussing New York State law's limits on predetermined damages and the Supreme Court's opinion in *Shady Grove*).

It should be noted that New York State policy supports denying Plaintiffs the right to seek the statutory penalty of $50 per purchase here. *See Kurtz*, 321 F.R.D. at 501–02; *Belfiore*, 311 F.R.D. at 54–59. CPLR Section 901(b) represents a policy decision of the New York State legislature. Historically, New York's use of "§," rather than "Rule," "section" being used for CPLR Section 901(b), denoted that only the New York State legislature had power to approve changes in the provision—as compared with federal civil rules developed essentially under Supreme Court control. *See* Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 102.01 (David L. Ferstendig ed., 2019) ("Originally, the Judicial Conference [of New York]

was authorized to adopt, amend or rescind rules of civil practice in the CPLR, subject to legislative approval. This power was limited to the rules of the CPLR and did not extend to the sections of the CPLR. The State Legislature also had the power to amend, repeal or add to the rules or sections by legislative act.").  The distinction between sections and rules was eliminated in 1978 without any change in the policy underlying governance of CPLR Section 901(b).  *Id.*

The damages issue, in light of the settlement of all but claims by New Yorkers, presents serious substantive legal questions controlling the litigation.

Should the parties begin settlement discussions again, they should consider doing so in a manner that would harmonize any relief granted by this court with that afforded by the geographically expansive Procter & Gamble settlement so that national uniform products can be produced by each defendant.

The parties' motions to exclude the testimony of Weir and Dr. Ugone are rejected.  The decision certifying a Rule 23(b)(3) class is reasserted.  Common issues predominate over individual issues.

<div style="margin-left:40%">

SO ORDERED.

  s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

</div>

Dated:  October 25, 2019
         Brooklyn, New York

<div style="text-align:center">30</div>